**UNITED STATES of America,
Appellee,**

**v.**

**Richard H. GENS, Defendant, Appellant,**

**UNITED STATES of America,
Appellee,**

**v.**

**Anthony W. CARLETON, Defendant,
Appellant.**

**UNITED STATES of America,
Appellee,**

**v.**

**Richard T. PORTER, Defendant,
Appellant.**

**Nos. 73–1220 to 73–1222.**

United States Court of Appeals,
First Circuit.

Argued Jan. 10, 1974.

Decided March 13, 1974.

**217**

Harold Hestnes, Boston, Mass., with whom James D. St. Clair, Robert F. McLaughlin, and Hale & Dorr, Boston, Mass., were on brief, for Richard H. Gens, defendant, appellant.

William P. Homans, Jr. and Edward J. Lonergan, Boston, Mass., with whom Julian T. Houston, Featherston, Homans, Klubock & Griffin, Paul G. Counihan, Robert E. McLaughlin, and The McLaughlin Brothers, Boston, Mass., were on brief, for Anthony W. Carleton and Richard T. Porter, defendants, appellants.

George V. Higgins, Sp. Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., was on brief, for appellant.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

McENTEE, Circuit Judge.

Appellants were convicted on eight counts of willfully misapplying funds of the Massachusetts Bank and Trust Company of Brockton, Massachusetts, a federally-insured bank, in violation of 18 U.S.C. § 656 (1970).[1] Several issues are raised in this consolidated appeal, including adequacy of the indictment, sufficiency of the evidence and the correctness of the trial court's charge to the jury. We reverse.

## I.

The grand jury indicted appellants on eleven counts charging willful misapplication of bank funds. Upon the government's motion, Counts 3, 5, and 8 were dismissed prior to trial. The remaining counts, on which appellants were convicted, charged that appellants committed willful misapplication "in that they granted and caused to be granted" eight unsecured loans to parties "who [were], then and there, as the defendants well knew, not the actual beneficiar[ies] of said loan[s]."[2] The indictment further

---

[1]. The statute reads in pertinent part:

"§ 656. *Theft, embezzlement, or misapplication by bank officer or employee.*

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve Bank, member bank, national bank or insured bank, or a receiver of a national bank, . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

* * * "

There is no question in the instant case that the bank was federally-insured within the meaning of the statute.

[2]. The eight loans alleged in the counts were as follows:

Count 1.—On or about November 18, 1969, $15,000 to Hyman H. Silver.

Count 2.—On or about January 15, 1970, $25,000 to Hyman H. Silver.

Count 4.—On or about February 16, 1970, $6,000 to Hyman H. Silver.

charged "[t]hat by means of the granting of the said loan[s], the defendants converted the proceeds thereof to the use of [appellant] Gens." The foregoing is the complete extent of the physical acts alleged in the indictment.[3] It was further alleged that appellants Porter and Carleton were officers and directors of the bank at all times material to the eight counts, and that appellant Gens was a director at all times material to the final six counts.[4]

The evidence adduced at trial was as follows. In the fall of 1969, Porter and Carleton gained control of the Massachusetts bank. They did so with financial assistance from Gens, whose principal business was the operation of several nursing homes in the New England area.[5] At that time Gens' nursing homes were experiencing cash shortages, mainly due to delays in Commonwealth of Massachusetts welfare payments. To add needed cash to his business, Gens borrowed $80,000 from the Massachusetts bank. That amount represented the bank's self-imposed loan limit. The record is not clear, but apparently Gens' business also borrowed funds from the bank at this time.

Besides these loans directly to Gens and his business, during the next twelve months the bank also granted the eight loans totaling $235,000 which are in issue in this case. It was undisputed at trial that the named debtors turned over

Count 6.—On or about March 16, 1970, $34,000 to Hyman H. Silver.

Count 7.—On or about March 21, 1970, $55,000 to Felopoulos & Ditelberg, a law firm.

Count 9.—On or about June 5, 1970, $80,000 to Charles Roazen.

Count 10.—On or about September 17, 1970, $10,000 to J. Peter Felopoulos.

Count 11.—On or about September 17, 1970, $10,000 to Dennis Ditelberg.

3. For example, Count 4 of the indictment, in its entirety, provided as follows:

"A. That at all times material to this count, Massachusetts Bank and Trust Company at Brockton in the District of Massachusetts was a bank the deposits of which were insured by the Federal Deposit Insurance Corporation of the United States.

B. That at all times material to this count, Richard T. Porter was an officer, director, agent and employee of the said bank.

C. That at all times material to this count, Anthony W. Carleton was an officer, director, agent and employee of the said bank.

D. That at all times material to this count, Richard H. Gens was a director of the said bank.

E. That on or about February 16, 1970, Richard T. Porter, Anthony W. Carleton and Richard H. Gens, with intent to injure and defraud the said bank, knowingly, wilfully misapplied, and caused to be misapplied, moneys, funds and credits of said bank, and moneys, funds, assets and securities intrusted to the custody and care of the said bank, and to the custody and care of them as officers and directors of the said bank, in that they granted and caused to be granted, by the said bank, a loan in the amount of $6,000, more or less, without security therefor being given to the said bank, to Hyman H. Silver, who was, then and there, as the defendants well knew, not the actual beneficiary of the said loan.

F. That by means of the granting of the said loan, the defendants converted the proceeds thereof to the use of the said Richard H. Gens."

The other seven counts were essentially identical, simply substituting references to the other loans listed in n. 2, except that Counts 1 and 2 also omitted the allegations contained above that Gens was a director of the bank at the time of the pertinent loans.

4. Because Gens did not hold a position with the bank at the time of the loans alleged in Counts 1 and 2, it is clear that he could not have been convicted as a principal under § 656. The court, in its charge to the jury, said nevertheless that Gens could be convicted as an aider and abettor. *But see* United States v. Tornabene, 222 F.2d 875 (3d Cir. 1955).

5. Prior to the takeover, the bank had been experiencing difficult times and needed fresh financial investment. An arrangement was made by which Porter and Carleton would receive effective control of the bank in exchange for their purchase of $400,000 in the bank's convertible debentures. Lacking that much money on their own, Porter and Carleton enlisted the financial support of others in acquiring the needed debentures. Gens was among those who came in with them, purchasing $40,000 worth. His business partner, Hyman H. Silver, also purchased $40,000 worth.

the proceeds of all eight loans to Gens, and that he in turn invested these sums in the nursing homes. The eight loans are best described in three categories: four loans to Hyman H. Silver; one loan to Charles Roazen; and three to J. Peter Felopoulos, Dennis Ditelberg and their law firm.

Hyman H. Silver was for many years Gens' partner in the nursing home business. At trial Silver acknowledged signing for the four loans from the Massachusetts bank alleged in Counts 1, 2, 4 and 6, in the total amount of $80,000. He testified that he had neither sought these loans nor received the proceeds. All he did was sign papers for them at the behest of his partner Gens. He also said he presumed Gens would employ the loan proceeds in their nursing home business, which is what Gens did. Silver further testified that these sort of cursory financial transactions on his part were not unusual. Over the years he had been in charge of the day-to-day operations in their business, while Gens was in charge of finances. Silver said he routinely signed whatever financial papers Gens placed before him, apparently even when such papers were blank notes representing his personal obligation rather than that of their business.[6] On cross-examination, Silver said that he recognized in signing for such loans that he could be held personally respon-sible for their repayment should the business fail to do so, even though he personally did not receive the proceeds.[7] Silver also testified that at the time he signed for the four loans in issue in this case he had a net worth of between $500,000 and $700,000. It may be, however, that these figures represented the assets of the nursing home business as well as Silver's personal assets. The general impression derived from Silver's testimony is that he rarely, if ever, distinguished his personal finances from those of the nursing home business.

Charles Roazen was a neighbor and close friend of Silver and through him became acquainted with Gens. At trial, Roazen acknowledged signing for the $80,000 loan alleged in Count 9 and further testified that upon deposit of that sum in his account he immediately made out a check to Gens for the same amount. According to Roazen, the loan came about in the following manner. Sometime around January 1970 Gens said that he, Silver, Porter and Carleton wanted to purchase stock in yet another bank, the Garden City Bank and Trust Company of Newton, Massachusetts. Gens told Roazen that they needed a fifth person "to come in with them because they were going to use money borrowed from the Massachusetts Bank and Trust Company." Gens said that he and Silver had borrowed up to their limits at the Massachusetts bank[8] and that

---

6. Silver specifically testified as follows:

"[Silver]: If I could explain how it went, I would come in in the morning and go out and come back in late in the afternoon. Mr. Gens usually would say to me, 'Are you going to be in tomorrow morning?' I would say, 'No, I'm going, wherever I'm going.' 'I'm going to need some money. Do you want to sign these?' I would sign some blank notes. We have done that. I know it's wrong. We have done it over a period of years."

Indeed, Silver could not actually recall signing for the fourth loan alleged in the indictment, presumably because he did so in the same casual manner described above. Silver did acknowledge his signature on the loan when it was shown to him, and testified on the assumption that he signed it. There was no suggestion of forgery.

7. We note the following exchange in the record:

"[Q] Mr. Silver, there is no question but when you signed these notes, at least those that you remember you did sign, it is your personal obligation to pay back that money to the Massachusetts Bank and Trust Company?

A. If the company didn't pay.

Q. You understand that?

A. Yes, if the company didn't pay.

The Court: Were those personal borrowings on your part and were you the beneficiary of those loans?

The Witness: I was not. The money went into the company."

8. As noted earlier, this bank had a self-imposed loan limit of $80,000 per party. We also note that the loans to Silver and Roa-

Porter and Carleton did not want their names publicly associated with the stock purchase. Despite vigorous cross-examination suggesting otherwise, Roazen maintained that it was his understanding that although he was to sign for a loan to help out the other four, he personally would not have to repay the loan, barring some "catastrophe."[9] Roazen said he agreed to this proposal because he and Silver had been friends for a long time. In addition, Gens had pointed out to Roazen that the stock purchase would be beneficial to Roazen's automotive-parts business because the Garden City bank thereafter would be amenable toward making loans to Roazen's customers. Roazen's position was also supported by the fact that when the Garden City bank stock purchase was called off, Gens felt free to invest the $80,000 proceeds of the Roazen loan into his cash-hungry nursing home business. He did not consult Roazen on this. On the other hand, appellants' position that Roazen had agreed to purchase stock in the bank along with the four others, and that the loan was clearly a personal obligation of Roazen's, is supported by a letter which Gens gave Roazen at the time of the loan, evidencing a beneficial interest on Roazen's part in the stock to be acquired.[10] Also, there is no question that Roazen was a man of wealth who

could afford to repay the $80,000 loan. On this record the jury could reasonably have reached either conclusion as to Roazen's agreed-upon role with respect to the loan that he signed for.

Finally, J. Peter Felopoulos and Dennis Ditelberg were partners in a law firm which did a substantial amount of work for Gens and Silver's nursing home business around the time of the loans in question. These two attorneys testified that in early 1970 Gens and Silver came to them and asked to borrow money for their business. They replied that they had no cash available. Gens and Silver then told the attorneys that if they could present a financial statement, "they could perhaps arrange a loan for us; and, that's how we got to know the Massachusetts Bank and Trust Company." Subsequently, the loans cited in Counts 7, 10 and 11, in the total amount of $75,000, were arranged. The two attorneys never personally went to the bank or spoke with Porter or Carleton about these loans. Instead, after financial statements were prepared, Gens brought them the notes and they signed them. Immediately after each loan, the proceeds were forwarded to Gens by check. In exchange, they received notes from Gens and Silver. Like Silver, Felopoulos and Ditelberg said that they "fully recognized" that the three loans

zen were each in that total amount, and that the loans to Felopoulos and Ditelberg were in the total amount of $75,000.

9. We note the following excerpts from the cross-examination of Roazen:

"Q. You were not, in your mind, acting as a straw for Mr. Gens or Mr. Silver, were you?

A. What do you mean by a 'straw'?

Q. Lending your name to them, were you?

A. In a sense, I would say yes.

    *     *     *     *     *

The Court: When you borrowed that money, did you understand you would pay the $80,000 back?

The Witness: No sir, I was not supposed to pay one cent of it back.

The Court: Go ahead.

Q. (By Mr. St. Clair) When did you say that?

A. It's the answer to what the Judge asked me.

Q. You understood you would never have to pay the bank back anything?

A. I shouldn't say 'never'. I would think that if the Massachusetts Bank folded or some catastrophe happened, I would have to stand my share, one-fifth."

10. The letter read in pertinent part:

"Dear Chuck:

This will acknowledge receipt of the sum of $80,000 for your participation in the stock acquisition of Garden City Trust.

As you are aware, I will acquire the stock in my name and will be holding the same for your benefit along with the other participants.

When the stock is received, a duly-executed trust document will be forwarded to you.

In the meantime, this letter will serve as evidence of your interest."

from the Massachusetts bank were personal obligations of theirs. The apparent motive was the attorneys' desire to keep the favor of a substantial client. There appears to be no question that they possessed sufficient resources at the time to repay the three loans. At the close of the government's case, appellants moved for judgment of acquittal for lack of evidence. These motions were denied.

In its charge to the jury, the trial court first stated that the government's theory of willful misapplication was as follows:

> ". . . that Defendant Gens dominated and controlled Defendants Porter and Carleton or at least worked in concert with them to arrange loans to the persons named in each count in the indictment, knowing that such person was not the true borrower and that Defendant Gens was to be the true beneficiary thereof, and that each of such persons was used as the borrower either with or without the knowledge and consent of the common borrower in order to disguise the concentration of the bank's funds to Defendant Gens."

The court then instructed the jury that it had to find that appellants "misapplied or caused to be misapplied money, funds, or credits of the bank by granting a loan for the amount and to the person named in the particular count so that these funds could be converted to the use of Defendant Richard H. Gens." These two excerpts from the charge were the only descriptions instructing the jury as to the acts which it could find constituted willful misapplication. On this basis, the jury found each appellant guilty on all eight counts.

## II.

We think that the indictment and the charge to the jury, at best, did not give the jury adequate guidance as to precisely what acts constitute .willful misapplication of bank funds in violation of § 656. The most likely interpretation of the indictment and the court's charge was that appellants should be found guilty if it was found that they granted loans to the named debtors knowing that the proceeds would be turned over to Gens. For the reasons that follow, such a finding by itself is not sufficient to constitute willful misapplication under § 656. Therefore, the convictions cannot stand.

As employed in § 656, the term "willfully misapplied" has generally been held to have no settled meaning. *See, e. g.,* United States v. Britton, 107 U.S. 655, 669, 2 S.Ct. 512, 27 L.Ed. 520 (1883); Mulloney v. United States, 79 F.2d 566, 581 (1st Cir. 1935), cert. denied, 296 U.S. 658, 56 S.Ct. 383, 80 L. Ed. 468 (1936).[11] Instead, during the past hundred years it has been left to the courts to define the acts which constitute willful misapplication of bank funds within the meaning of the statute. During this period several cases have involved situations roughly analogous to the instant case, i. e., instances of bank loans made to named individuals who, with the knowledge of bank officials, passed on the proceeds to third parties. But willful misapplication of bank funds has not been found in all such situations.

The cases of this type in which willful misapplication has been found fall into three general categories. First, those in which bank officials knew the named debtor was either fictitious or wholly unaware that his name

---

11. *But cf.* United States v. Moraites, 456 F. 2d 435, 441 & n. 9 (3d Cir.) (dictum), cert. denied, 409 U.S. 891, 93 S.Ct. 109, 34 L.Ed. 2d 148 (1972) (suggesting that since the *Britton* decision the term "willfully misapplied" has acquired a technical meaning of its own). *See also* United States v. Ar-chambault, 441 F.2d 281, 283 (10th Cir.), cert. denied, 404 U.S. 843, 92 S.Ct. 140, 30 L.Ed.2d 78 (1971) ; United States v. Fortunato, 402 F.2d 79, 81 (2d Cir. 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969).

was being used. *See, e. g.,* United States v. Stokes, 471 F.2d 1318 (5th Cir. 1973) (fictitious debtor); United States v. Schmidt, 471 F.2d 385 (3d Cir. 1972) (per curiam) (named debtor never authorized use of his name for any purpose). Second, cases in which bank officials knew the named debtor was financially incapable of repaying the loan whose proceeds he passed on to the third party. *See* Mulloney v. United States, *supra* 79 F.2d at 581.[12] Third, cases in which bank officials assured the named debtor, regardless of his financial capabilities, that they would look for repayment only to the third party who actually received the loan proceeds: in other words where the debtor allowed only his name to be used, enabling the bank officials to grant a *de facto* loan to a third party to whom the bank was unwilling to grant a formal loan. *See, e. g.,* United States v. King, 484 F.2d 924 (10th Cir. 1973) cert. denied, 42 U.S.L.W. 3555 (U.S. April 1, 1974); United States v. Moraites, 456 F.2d 435 (3d Cir.), cert. denied, 409 U.S. 891, 93 S.Ct. 109, 34 L. Ed.2d 148 (1972).[13] In the three situations described above, the loans formally being made could be characterized as "sham" or "dummy" loans, because there was little likelihood or expectation that the named debtor would repay. The knowing participation of bank officials in such loans could consequently be found to have a "natural tendency" to injure or defraud their banks and thus consti-

tute willful misapplication within the meaning of § 656. Mulloney v. United States, *supra* 79 F.2d at 584; Galbreath v. United States,. 257 F. 648, 656 (6th Cir. 1918).

■ On the other hand, · where the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot—absent other circumstances—properly be characterized as sham or dummy, even if bank officials know he will turn over the proceeds to a third party. Instead, what we really have in such a situation are two loans: one from the bank to the named debtor, the other from the named debtor to the third party. The bank looks to the named debtor for repayment of its loan, while the named debtor looks to the third party for repayment of his loan. If for some reason the third party fails to make repayment to the named debtor, the latter nonetheless recognizes that this failure does not end his own obligation to repay the bank. In this situation, the bank official has simply granted a loan to a financially capable party, which is precisely what a bank official should do. There is no natural tendency to injure or defraud the bank, and the official can not be said to have willfully misapplied funds in violation of § 656.[14] *See* United States v. Docherty, 468 F.2d 989 (2d Cir. 1972); *cf.* Giragosian v. United States, 349 F.2d 166 (1st Cir. 1965); Johnson v. United States, 95 F.2d 813

---

12. Of course, where bank officials knowingly grant loans to financially incapable parties, such conduct in and of itself constitutes willful misapplication, whether or not the debtor passes on the loan proceeds to a third party. *See, e. g.,* United States v. Joiner, 429 F.2d 489 (5th Cir. 1970); Robinson v. United States, 30 F.2d 25 (6th Cir. 1929).

13. We also note the case of Gordon v. United States, 438 F.2d 858 (5th Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56, rehearing denied, 404 U.S. 960, 92 S.Ct. 312, 30 L.Ed.2d 279 (1971), in which the many defendants appear to have engaged in loan transactions falling within all three of these categories.

14. We do not go so far as to say that the obligation of a financially responsible party

to a bank will in all cases mean that post-loan transfer to a third party will not result in liability for willful misapplication. For example, there may well be situations where the funneling of funds from marginally responsible borrowers to a third party engaged in a high risk venture would tend to injure the bank. But we need not explore this matter further at this time. The government made no allegation and offered no proof beyond the bare contention that funds were concentrated in Gens' hands. In the absence of a showing of special circumstances demonstrating injury or risk of injury to the bank despite the obligation of a financially responsible party to the bank, liability cannot be found.

(4th Cir. 1938). For example, in *Doch-erty*, involving a factual situation quite similar to the instant case, the court held that where a named debtor knew he was putting his own credit "on the line" and possessed the financial means to re-pay, there was insufficient evidence of willful misapplication of bank funds even though he turned over the loan pro-ceeds to a third party. 468 F.2d at 995.[15]

Throughout the trial the government has argued to the contrary. It contends that willful misapplication occurs when-ever bank officials grant loans to parties with the knowledge that the proceeds will go to a third party. In support of this proposition, the government relies on two cases, United States v. Cooper, 464 F.2d 648 (10th Cir. 1972), cert. de-nied, 409 U.S. 1107, 93 S.Ct. 902, 34 L. Ed.2d 688 (1973), and Hargreaves v. United States, 75 F.2d 68 (9th Cir.), cert. denied, 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1935). However, both cases more readily fall within the three categories of willful misapplication out-lined above. The loans in *Cooper* appear to have been to parties who were not held responsible for repayment. They never made any payments of their own on the loans. Instead, the third-party recipient made the payments. 464 F.2d at 650–651. Similarly, the loan in *Har-greaves* appears to have been to a finan-cially irresponsible party. He testified that it was a question "whether he was worth it unsecured" and that he never expected to pay it. 75 F.2d at 70; *see* United States v. Docherty, *supra* 468 F. 2d at 992, 994. The government's theo-ry of willful misapplication goes much too far and is without case or policy support.

III.

In addition to holding that the jury was incorrectly instructed on the standard for willful misapplication, we also hold that, with respect to seven of the eight counts, there was insufficient evidence adduced at trial to find appel-lants guilty under the correct standard. Silver, Felopoulos and Ditelberg were real persons who were financially capa-ble of repaying the loans they signed for. Moreover, there was no evidence presented which might rebut their asser-tions that they fully recognized their personal obligations to repay these loans. Thus, absent special circumstances, *see* n. 14, *supra*, there was no basis for the jury to find that the seven loans cited in Counts 1, 2, 4, 6, 7, 10, and 11 were shams. They simply were loans to fi-nancially-capable parties who reloaned the proceeds to Gens.[16] We note that Silver subsequently signed a personal guarantee on the loans to him, and that Felopoulos and Ditelberg have made payments on the loans to them.

On the other hand, although Roazen was a real person and a wealthy one to boot, there was evidence from which the jury could conclude that nei-ther he nor appellants expected him to pay back the loan cited in Count 9, and that instead the bank looked only to Gens for repayment. However, in view of the indictment and jury instructions, the jury may alternatively have found only that the loan was properly made to Roazen and that he reloaned the pro-ceeds to Gens. Therefore, we reverse the convictions of Gens, Porter and Car-leton on Counts 1, 2, 4, 6, 7, 10 and 11, vacate their convictions on Count 9, and

15. Government counsel sought to distinguish *Docherty* at oral argument by noting, accu-rately, that the defendant in that case was the named debtor rather than, as here, the bank officials or the actual recipient of the proceeds. However, this distinction between *Docherty* and the instant case in no way blunts the key point made by the Second Circuit: that there can be no harm to the bank, and thus no misapplication, where the

named debtor is both financially capable and fully intends to repay the loan.

16. Indeed, since the nursing home business was as much Silver's as Gens', the proceeds of the loans to him were not truly reloaned to Gens. They simply were invested in their business at a time when cash was vitally needed. The prospective benefits of this in-vestment would flow equally to Silver and Gens.

remand for a new trial on said count. In view of this disposition, we do not reach the several other issues appellants have raised.