**UNITED STATES of America, Appellee,**

v.

**Kenneth Glen LUKE, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**W. Michael LOVERN, Appellant.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1982.

Decided March 3, 1983.

Rehearing and Rehearing En Banc Denied April 12, 1983.

William B. Disney, Patrick M. McSweeney, Richmond, Va. (James F. Stutts, McSweeney, Stutts & Burtch, Richmond, Va., on brief), for appellants.

William G. Otis, Sp. Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., Patricia A. Kerwin, David P. Baugh, Asst. U.S. Attys., Richmond, Va., on brief), for appellee.

Before HALL, MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

Kenneth G. Luke and W. Michael Lovern were convicted by a jury on all three counts of an indictment charging: (1) conspiracy to misapply bank funds and to make a false entry in bank records in violation of 18 U.S.C. §§ 2, 656, and 1005; (2) aiding, abetting and causing the making of a false entry in bank records, a violation of 18 U.S.C. §§ 2 and 1005; and (3) aiding, abetting and causing a misapplication of bank funds in contravention of 18 U.S.C. §§ 2 and 656. They appeal, arguing that the facts adduced at trial do not present the misapplication of bank funds or the making of a false entry necessary to sustain their aiding and abetting and conspiracy convictions.

The affair which concerns us began in mid-1979, by which time Peter Sheehy,[1] an assistant vice president of Central National Bank in Richmond, Virginia,[2] in his capacity as a lending officer, had authorized loans amounting to approximately $275,000 to

---

[1] The factual account presented here derives primarily from the testimony of Sheehy. As the bank officer responsible for the misapplication and false entry charged, Sheehy obviously could stand liable directly under § 656 and § 1005; he testified for the Government after reaching a plea bargaining agreement.

[2] Because Central National Bank is a "national bank," false entries and misapplications of funds to the bank's detriment fall within the purview of § 656 and § 1005.

Mastertrax, Inc., a music recording company owned by Rodney Seagream, and its surrogates. Mastertrax was in its infancy and, in the opinion of Sheehy's superiors at the bank, constituted a very risky borrower. The bank's management became distressed when it learned that Sheehy had lent $75,000 of the bank's money to Mastertrax. Compounding management's chagrin was the fact that Sheehy, in the view of his superiors, had exceeded his $50,000 lending limit on the Mastertrax account. Management was unaware of the additional $200,000 lent to Mastertrax. Had management known, "distress" and "chagrin" would presumably not be adequate terms to describe management's feelings. Sheehy, understandably concerned about his prospects for continued employment at the bank were the full extent of the Mastertrax borrowings revealed, purposely refrained from disclosing the complete $275,000 figure. Sheehy did succeed in temporarily allaying management's fears, however, by assuring his superiors that Mastertrax would be prepared to repay some $30,000 of its debt within a two to four week period.

Sheehy turned to Luke and Lovern for assistance. Appellants knew Sheehy well, for Sheehy already had lent approximately $122,000 to Luke and Lovern, a sum also apparently well in excess of Sheehy's lending authority. The loans were made either to Luke or Lovern personally, or to one of various carpet companies which the appellants owned. Sheehy asked Luke and Lovern, and they agreed, to speak to Seagream about the need for a quick repayment from Mastertrax.

Appellants met with Seagream,[3] stressing to him that "it was important that Mr. Sheehy be kept whole in his position at the bank." Seagream was also informed by the appellants that he should not be "a bit surprised if you should wake up one morning and your loans have been liquidated .... You won't know who or why they were liquidated, but you may find a receipt in the mail indicating that they have been paid in full."

On the day following their meeting with Seagream, Luke and Lovern paid a visit to Sheehy. They asked Sheehy if there was anything they could do to help him out of his Mastertrax predicament. Sheehy answered affirmatively: the two men could "assume the debt of Mastertrax." The plan was then sketched out. Rather than structuring a conventional assumption of liability, the three agreed that it would be preferable to get the bank's money to do their work for them. They agreed that $31,000 would be lent to one of the appellants' carpet companies; at the suggestion of one of the appellants, Sun Carpet was denominated the recipient. The proceeds of the loan would be deposited in Luke's personal savings account, which promptly would be debited to make the $30,000 repayment which Sheehy had assured the bank's management was forthcoming from Mastertrax.

The plan was executed accordingly. Luke signed a note from Sun Carpet, a note which made no mention whatsoever of Mastertrax. The money was, as planned, credited to Luke's savings account, and Sheehy made out a debit slip recording the fact that Mastertrax's liability was being paid with funds coming from Luke's account. Sheehy stayed on with the bank for another two and one-half months, authorizing an additional $74,000 in loans to appellants during that period.

I

◼ The Government's contention here is that the loan to Sun Carpet constitutes a misapplication of bank funds because, in purpose, effect, and reality, it was a "sham" transaction whereby Sun Carpet stood as a "strawman" for the ultimate and real borrower, Mastertrax. The appellants, by contrast, take the position that the transaction at issue involves, in actuality, two legitimate steps—the first, a bona fide loan made by the bank to Sun Carpet; the

---

3. Seagream testified for the Government, describing the meeting recounted here.

second, an equally bona fide loan or a gift made by Sun Carpet to Mastertrax. From our perspective, the question is whether the facts support a finding of "willful misapplication" of the bank's funds by Sheehy[4] under 18 U.S.C. § 656, which, in pertinent part, provides:

> Whoever, being an officer ... of ... any Federal Reserve Bank, member bank, national bank or insured bank ... willfully misapplies any of the moneys, funds or credits of such bank ... shall be fined not more than $5,000 or imprisoned not more than five years, or both ....

We do not write on a clean slate. "[S]everal cases have involved situations roughly analogous to the instant case, i.e., instances of bank loans made to named individuals who, with the knowledge of bank officials, passed on the proceeds to third parties." *United States v. Gens,* 493 F.2d 216, 221 (1st Cir.1974). As the court in *Gens* observed, "willful misapplication of bank funds has not been found in all such situations." *Id.* Rather,

> [t]he cases of this type in which willful misapplication has been found fall into three general categories. First, those in which bank officials knew the named debtor was either fictitious or wholly unaware that his name was being used. Second, cases in which bank officials knew the named debtor was financially incapable of repaying the loan whose proceeds he passed on to the third party. Third, cases in which bank officials assured the named debtor, regardless of his financial capabilities, that they would look for repayment only to the third par-

ty who actually received the loan proceeds: in other words where the debtor allowed only his name to be used, enabling the bank officials to grant a *de facto* loan to a third party to whom the bank was unwilling to grant a formal loan. *Id.* at 221–22 (citations omitted).

We are satisfied that the case here falls within the third category of willful misapplication explicated by the First Circuit in *Gens.* Indeed, without regard to Sun Carpet's financial capabilities, the evidence at trial established that Sheehy, in making the loan to Sun Carpet, did not intend to look to Sun Carpet for repayment. As Sheehy testified, repayments were to come as Mastertrax was able to make them. In addition, Sheehy's own practice lends credence to that testimony. Sheehy adopted a kind of "code" to communicate with Sun Carpet, whereby Luke and Lovern were informed that a Mastertrax payment was in the offing, a payment which immediately would be devoted to the Sun Carpet loan account.

Thus, the case is on a par with *United States v. King,* 484 F.2d 924 (10th Cir.1973), *cert. denied,* 416 U.S. 904, 94 S.Ct. 1607, 40 L.Ed.2d 108 (1974), and *United States v. Moraites,* 456 F.2d 435 (3d Cir.1972), *cert. denied,* 409 U.S. 891, 93 S.Ct. 109, 34 L.Ed.2d 148 (1972), where loans formally made to a named debtor were held to constitute misapplication because it was understood by the lending officer and the named debtor that repayment was to be expected from the third party who ultimately received the loan proceeds.[5] We find those holdings dispositive here. It is worth em-

---

4. In order to convict the appellants of aiding and abetting under Counts Two and Three of the indictment, the Government must show that Sheehy's actions constituted a violation of § 656 and § 1005. *See, e.g., United States v. Salinas,* 654 F.2d 319, 324 (5th Cir.1981). To sustain the conspiracy conviction under Count One, there likewise must be evidence sufficient to prove that the actions planned by Sheehy and the appellants are condemned under § 656 and § 1005. *See, e.g., United States v. Docherty,* 468 F.2d 989, 992 (2d Cir.1972). Because of our disposition of the substantive questions under both § 656 and § 1005, it is not necessary to consider whether the conspiracy conviction

could stand with proof that a violation of only one of the statutory provisions was the object of the conspiracy.

5. In *United States v. King,* 484 F.2d 924 (10th Cir.1973), *cert. denied,* 416 U.S. 904, 94 S.Ct. 1607, 40 L.Ed.2d 108 (1974), the loan proceeds ultimately were converted to the lending officer himself. In *United States v. Moraites,* 456 F.2d 435 (3d Cir.1972), *cert. denied,* 409 U.S. 891, 93 S.Ct. 109, 34 L.Ed.2d 148 (1972), the loan proceeds went to the benefit of both a fellow loan officer and, as is the case here, a prior borrower.

phasizing, as well, that, as recognized in *Gens,* such a "sham" loan has a " 'natural tendency' to injure or defraud" the bank, 493 F.2d at 222, and thus accords with our settled understanding of § 656:

> To show a misapplication, ... [a]ctual loss need not be proved ...; rather, it is sufficient that the defendant at least temporarily deprive the bank of possession, control or use of its funds.

*United States v. Duncan,* 598 F.2d 839, 858 (4th Cir.1979), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).[6]

### II

It follows from the preceding discussion that a false entry has been made sufficient to establish a violation of 18 U.S.C. § 1005, which provides, in relevant part:

> Whoever makes any false entry in any book, report, or statement of such [Federal Reserve Bank, member bank, national bank or insured bank] with intent to injure or defraud such bank ... —
>
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The loan to Sun Carpet was a "sham" transaction; the note signed by Luke on behalf of Sun Carpet was consequently a false entry. *See United States v. Krepps,* 605 F.2d 101, 109 (3d Cir.1979) (bank officer approved a loan to a strawman who then turned the proceeds over to the officer; held, the note, which omitted any reference to the true beneficiary of the loan, constituted a false entry because "the true nature of the transaction should have been entered in the bank's records"); *accord Phillips v. United States,* 406 F.2d 599 (10th Cir.1969).[7]

AFFIRMED.

---

6. In *United States v. Duncan,* 598 F.2d 839 (4th Cir.1979), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), the defendant bank officer ordered that certain of his checks be held undebited. The court held, when confronted with the defendant's contention that the bank never suffered because he was always ready and able to cover his undebited checks, that a misapplication nevertheless occurred because "[t]he gist of this critical element of the offense [i.e., misapplication] is the withdrawal of funds, however temporarily, from the possession, control or use of the bank." *Id.* at 860. Despite defendant's assumed ability to cover his checks, "the funds represented by the undebited cash items checks were at a variety of risks." *Id.* Such was the case here; Central National Bank faced a variety of new risks by virtue of the Sun Carpet loan. Yet the harm to the bank here was not limited to the risks directly associated with the loan itself. Indeed, the Sun Carpet loan enabled Sheehy to retain his position at the bank for another two and one-half months, and thus enabled Sheehy to place at risk another $74,000 of the bank's money through additional loans to Luke and Lovern.

7. "[A]n entry recording an actual transaction on a bank's books exactly as it occurred is not a false entry under [§ 1005] even though it is a part of a fraudulent or otherwise illegal scheme," *United States v. Erickson,* 601 F.2d 296, 302 (7th Cir.1979), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 406 (1979), and appellants contend that the debit slip written by Sheehy adequately conveys the true nature of the Sun Carpet loan. Even so, the note from Sun Carpet was deceptive. By resorting to it, bank management, public officers, and others would have been unable to obtain a true picture of the bank's condition. *See United States v. Darby,* 289 U.S. 224, 226, 53 S.Ct. 573, 574, 77 L.Ed. 1137 (1933). The entry is rendered no less false simply because, through considerable effort and a piecing together of minute details, the bank might have been able to discover the truth. *See Phillips v. United States,* 406 F.2d 599 (10th Cir. 1969) (microfilm bank records revealed true