UNITED STATES of America, Appellee,

v.

Robert Alexander BLACKWOOD, Appellant.

No. 83–5096.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1983.

Decided May 29, 1984.

---

**4.** *Id.* at 61.

Rebecca A. Baitty, Charleston, W.Va. (Rudolph L. Di Trapano, Di Trapano & Jackson, Charleston, W.Va., on brief), for appellant.

David A. Faber, U.S. Atty., Charleston, W.Va., for appellee.

Before WIDENER and ERVIN, Circuit Judges, and HOFFMAN, District Judge [*].

ERVIN, Circuit Judge:

In June of 1979 Robert Blackwood secured a $60,000 loan from the Citibank of Huntington, West Virginia ("the Bank") on behalf of Ohio-Kentucky Coal Services, Inc. Fifty thousand dollars of the loan was given to a business associate and officer of the Bank, Rex Whaley, who used the money to pay a personal debt. The Bank was closed in 1980. Subsequently, Blackwood was convicted of aiding and abetting Whaley in the misapplication of bank funds in violation of 18 U.S.C. §§ 2 and 656.[1] Blackwood appeals from that conviction on the grounds that the district court erroneously charged the jury and the evidence was insufficient to support his conviction. Finding merit in the first contention, we reverse the conviction and remand for a new trial.

## I.

In 1978 Rex Whaley became acquainted with Robert Blackwood, and the two formed Ohio-Kentucky Coal Services, Inc. (OKCS) with the understanding that each would own fifty percent of the stock. The two men established OKCS in order to build a coal barge loading facility (commonly referred to as a river tipple). OKCS secured funds for this project through bank loans. Under West Virginia law, the Bank was permitted to lend only ten percent of capital surplus to a corporate borrower. According to Whaley's testimony, this amounted to $180,000 for OKCS. OKCS, however, received an additional

---

[*] Honorable Walter E. Hoffman, United States District Judge for the Eastern District of Virginia, sitting by designation.

1. 18 U.S.C. § 656 provides in part as follows:

    "Whoever, being an officer . . . or employee of . . . any national bank or insured bank . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank . . . or any moneys, funds, assets or securities entrusted to the custody or care of such bank" shall be guilty of a violation of 18 U.S.C. § 656.

    18 U.S.C. § 2 provides as follows:

    (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal;

    (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

$445,000 in Bank funds through loans to three other corporations controlled by Blackwood or Whaley. All the loans, except for the one at issue, were used to fund construction of the river tipple.

On June 27, 1979, Whaley met with Blackwood and explained that he (Whaley) owed Security Bank $50,000 on a loan that Security would not renew. He asked Blackwood to borrow the money in the name of OKCS and turn it over to him so that he could pay Security. The next day, Whaley told a loan officer at the Bank, Karl Bennett, that he had spoken with Blackwood and that Blackwood would be coming in to apply for a $50,000 loan. Blackwood applied for and received a $60,000 loan that day in the name of OKCS. On the loan interview memo, the space marked "purpose of loan" was left blank, and no testimony indicated that Blackwood actively misrepresented the purpose of the loan. That day, Blackwood handed Whaley a check for $50,000.

According to testimony at trial, the Bank's Board of Directors routinely approved any loans that Whaley requested be approved. In 1979 and 1980, poor liquidity had become a chronic problem for the Bank. This shortage of funds often forced the Bank to turn down mortgage applicants and also was one of the reasons the West Virginia Department of Banking decided to close the Bank in September of 1980.

After the Bank closed, Pilgram Coal Co. bought OKCS' interest in the unfinished river tipple. Pilgram paid in excess of $1,300,000 for the tipple, $800,000 of which was to discharge the various loans on the project. At the time of trial, the tipple was netting $400,000 annually.

## II.

To prove its case, the government had to establish that Whaley willfully misapplied bank funds[2] and that Blackwood actively collaborated in the commission of the crime.[3] The district court instructed the jury on the meaning of willful misapplication as follows:

> To "misapply" a bank's money or property means the willful conversion or taking by a bank employee of such money or property for his own use or benefit, or the use and benefit of another, whether or not such money or property has been intrusted to his care, and with intent to defraud the bank.
>
> ... An act or omission is "willfully" done, if done voluntarily and intentionally and with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law.
>
> To act with intent to injure or defraud means to act with intent to deceive or cheat, ordinarily for the purpose of causing a financial loss to someone else, although it is not necessary that the bank has suffered an actual loss, or to bring financial gain or benefit to one's self, the tendency of which may have been to harm the bank.

Blackwood contends that this charge is erroneous in two respects. First, he argues that it inaccurately states the definition of misapplication as set forth in *United States v. Gens*, 493 F.2d 216 (1st Cir.1974). Second, he contends that it fails to instruct that intent to inflict pecuniary injury is an essential element of the offense as required by this court in *United States v. Arthur*, 602 F.2d 660, 663 (4th Cir.) *cert. denied*, 444 U.S. 992, 100 S.Ct. 524, 62 L.Ed.2d 422 (1979).

---

**2.** Blackwood also argues that even if there was evidence of misapplication there was no evidence that it was accomplished by virtue of Rex Whaley's official relation to the Bank. This argument is without merit. Whaley testified that the morning Blackwood obtained the loan, "I went in the bank and told [Karl Bennett, the Bank loan officer] that I'd talked with Mr. Blackwood and that Mr. Blackwood would come in and apply for a $50,000 loan." Blackwood's loan application was approved and processed that day. It was fair for the jury to infer that Whaley, by virtue of his position in the bank, secured this instant loan for Blackwood.

**3.** *See supra* note 1.

In *United States v. Gens*, the First Circuit comprehensively reviewed cases that have construed the term "willfully misapplied" as employed in § 656. The court concluded that cases of this type fall into three general categories: 1) those in which bank officials knew that the named debtor was either fictitious or unaware his name was being used; 2) those in which bank officials knew that the named debtor was financially incapable of paying the loan, and 3) those in which bank officials assured the named debtor that they would look only to the third party who actually received the loan proceeds for repayment. 493 F.2d at 221–222. The court stated that:

> In the three situations described above, the loans formally being made could be characterized as "sham" or "dummy" loans, because there was little likelihood or expectation that the named debtor would repay. The knowing participation of bank officials in such loans could consequently be found to have a "natural tendency" to injure or defraud their banks and thus constitute willful misapplication within the meaning of § 656....
>
> On the other hand, where the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot— *absent other circumstances* —properly be characterized as sham or dummy, even if bank officials know he will turn over the proceeds to a third party. Instead, what we really have in such a situation are two loans: one from the bank to the named debtor, the other from the named debtor to the third party.... In this situation, the bank official has simply granted a loan to a financially capable party, which is precisely what a bank official should do. There is no natural tendency to injure or defraud the bank, and the official can not be said to have willfully misapplied funds in violation of § 656.

493 F.2d at 222 (emphasis added).

In a footnote, the *Gens* court elaborated on "other circumstances" in which liability might be found. It examined cases finding liability outside the three categories and concluded that "in the absence of a showing of special circumstances demonstrating risk of injury to the bank despite the obligation of a financially responsible party to the bank, liability cannot be found." 493 F.2d at 222 n. 14. In *United States v. Luke*, 701 F.2d 1104, 1107 (4th Cir.1983), this court, noting that "we do not write on a clean slate," adopted the categories established in *Gens*. Like this case, *Luke* involved bank loans made to individuals who, with the knowledge of bank officials, passed on the proceeds to a third party.

■ A comparison of the district court's charge with the standard established in *Gens* reveals error. Applying the district court's instruction, a jury could find Whaley guilty of misapplication, and thus Blackwood guilty of aiding and abetting, if it found that Whaley deceptively converted bank funds, "the tendency of which *may* have been to harm the bank." (emphasis added). Following this instruction, the jury did not need to find that OKCS was financially incapable of repaying or was not expected to repay the loan, as required by *Gens* and *Luke*. Nor was the jury required to find special circumstances demonstrating risk of injury to the Bank despite the obligation of a financially responsible party.

Furthermore, the district court's charge is inconsistent with our holding in *United States v. Arthur*, 602 F.2d at 663. In *Arthur*, we concluded that "a jury in a § 656 prosecution must be properly instructed that intent to inflict pecuniary injury to the bank is an essential element of the offense ...." The district court instructed that under § 656 a person must act "*ordinarily* with the purpose of causing a financial loss to someone else ... or to bring financial gain ... to one's self, the *tendency* of which may have been to harm the bank." (emphasis added). Applying this instruction, the jury did not need to find intent to cause pecuniary injury in order to convict.

Because the jury charge made it possible for the jury to convict by applying an incorrect legal standard, it constitutes reversible error. *See United States v. Walker,* 677 F.2d 1014, 1016, n. 3 (4th Cir.1982).

### III.

■ Blackwood also contends that the evidence was insufficient to convict under the correct legal standard and thus his conviction should be reversed without remand. "The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, *any* rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir.1982). We must grant the government "all reasonable inferences from the facts proven to those sought to be established." *Id.*

Applying this strict standard of review, we conclude that there is evidence from which a reasonable jury could have found Blackwood guilty of aiding and abetting the misapplication of bank funds. Although the evidence does not indicate that OKCS was financially incapable of repaying the loan or was not in fact expected to repay, there is evidence from which a jury could infer that special circumstances posed a risk of financial injury to the Bank. In a financial statement dated 1979, OKCS listed assets of only $58,000. In addition, Eber Light, an attorney employed by the bank in 1980 to prepare a prospectus for stock issued two years earlier, testified that he discovered that many loans to OKCS were, in his opinion, not properly secured. Light testified that the loans used by OKCS to finance the tipple construction were secured in 1979 by an option to lease the property on which the river tipple was being built. Light stated that

the option to lease had contingency requirements that had not been met and therefore was subject to recision. Blackwood counters that the loans to OKCS were adequately secured by the Ohio-Kentucky Coal Company, Inc. and by personal endorsement.

Granting the government the benefit of every reasonable inference, we conclude that Light's testimony raises a jury question as to whether special circumstances existed which caused the loan in question to pose a risk of injury to the Bank.[4]

### IV.

Although the evidence was sufficient to create a jury question, the district court did not properly charge the jury on the controlling legal standards. Therefore, the conviction is reversed and the case remanded for a new trial if, in light of this opinion, the United States Attorney deems it advisable to proceed with the prosecution.

REVERSED AND REMANDED.

---

**4.** Under *United States v. Arthur,* the jury would need to conclude that Whaley intended to inflict pecuniary injury on the bank. Although the question is close, we find that it would not be irrational for the jury to infer that Whaley and Blackwood had knowledge of the poor security underlying OKCS's loans and that their actions in securing a personal loan in the name of OKCS with knowledge of this poor security exhibited an intent to inflict pecuniary injury on the bank.