862 F.2d 316
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jake E. CANTRELL, Defendant-Appellant.
 No. 88-5003.
 United States Court of Appeals, Sixth Circuit.
 Nov. 15, 1988.
 
 Before BOYCE F. MARTIN, Jr. and DAVID A. NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is an appeal from a conviction for willful misapplication of bank funds. Finding that the trial court did not err in allowing the case to go to the jury, and that reversal is not required for any of the other reasons advanced by the appellant, we shall affirm the conviction.
 
 
 2
 * 18 U.S.C. Sec. 656 reads in part as follows:
 
 
 3
 "Whoever, being an officer, director, agent or employee of, or connected in any capacity with any ... insured bank ... willfully misapplies any of the moneys, funds, ... assets or securities intrusted to the custody or care of such bank ... shall be fined not more than $5,000 or imprisoned not more than five years, or both...."
 
 
 4
 The defendant in this case, Jake Cantrell, was involved in the establishment and operation of three banks in Tennessee and Georgia: The Dayton Bank and Trust Company of Dayton, Tennessee; the Farmers Bank and Trust Company in Winchester, Tennessee (through its holding company, Farmbanc); the Bank of Cumming, in Cumming, Georgia. According to S.R. "Russ" McGee, a business associate, Cantrell wanted to buy more stock in Farmbanc, but was limited by Tennessee's chain banking laws in the amount of stock he could hold. Cantrell therefore asked McGee to take out a loan from Dayton Bank & Trust Company and buy the stock for him. Cantrell undertook to give McGee a note to cover McGee's indebtedness.
 
 
 5
 The President of Dayton Bank & Trust Company, J. Walter Spiva, testified at trial that although he did not know how much Dayton Bank stock Cantrell controlled, Cantrell and the bank "pretty much were identified synonymously." From the time Spiva began working for Dayton Bank & Trust, he said, Cantrell "had been pretty much the head of the bank, the ultimate authority."
 
 
 6
 One day in January of 1983 Cantrell called Spiva and told him that Russ McGee's income was going to be increased by $100,000. (McGee had earned about $60,000 in 1982.) Cantrell said, according to Spiva, that McGee was looking for a place to invest his extra money and had decided to purchase shares in Farmbanc. Because of the advent of bank deregulation in Tennessee, it was believed that this stock would appreciate in value. Cantrell told Spiva that he had committed the bank to lend McGee $412,000 to buy the stock, and Spiva was instructed to do the necessary paperwork. Cantrell also told Spiva that although the financial statement on file for McGee could not support a loan of that size, a new financial statement, reflecting a larger income, would be forthcoming.
 
 
 7
 Although he had some doubts about the loan, Spiva followed Cantrell's instructions and advanced McGee the money under a loan agreement dated January 23, 1983. Spiva testified that the board of directors of the Dayton Bank was never informed that Cantrell had any financial interest in the loan. Shortly after the loan was made, the Bank of Cumming assumed 90 percent of it through a $372,000 "participation."
 
 
 8
 Upon receiving the loan proceeds, McGee testified, he handed the money over to Cantrell, his "agent." Cantrell gave McGee a $412,000 note to cover the contingency of the bank's calling the loan.
 
 
 9
 Cantrell used the $412,000 to purchase 10,000 shares of Farmbanc stock in McGee's name. In March of 1983 McGee signed an agreement giving Cantrell an option to buy the stock at the original purchase price. (Cantrell never exercised this option.) In due course, Cantrell supplied McGee with funds to make the first loan payment, which was due in July of 1983, and to make a second loan payment in January of 1984.
 
 
 10
 McGee decided in 1984 to take a new job with an insurance company. He observed at this time that the Farmbanc stock was not performing as well as anticipated, and he asked Cantrell to pay off the loan. According to McGee's testimony, Cantrell did so.
 
 
 11
 Meanwhile, a bank examiner discovered the existence of the loan during an examination of the Bank of Cumming. The discovery led ultimately to Cantrell's being indicted and tried for violating 18 U.S.C. Sec. 656 and 18 U.S.C. Sec. 2. The indictment charged that Cantrell,
 
 
 12
 "Being in fact an officer of Dayton Bank and Trust Company, Dayton, Tennessee, and connected to said bank in his capacity as a de facto officer of said bank and a shareholder of Rhea Bancshares, Inc., the holding company of said bank, the deposits of which bank were then insured by the Federal Deposit Insurance Corporation, with intent to injure and defraud said bank, did willfully and knowingly misapply and cause to be misapplied monies of the said bank in the amount of $412,000 in that he, Jake E. Cantrell, caused Walter Spiva, an officer of Dayton Bank and Trust Company to make [a] Dayton Bank and Trust Company bank loan in the amount of $412,000 in the name of S.R. McGee, Jr., of which he, Jake E. Cantrell, was the true and undisclosed beneficiary."
 
 
 13
 The jury returned a verdict of guilty, and Cantrell was sentenced to five years imprisonment and a fine of $5,000, the maximum penalty provided for in the statute.
 
 II
 
 14
 The first issue presented is whether Cantrell could properly be found to have had enough of a connection with the Dayton Bank to be covered under 18 U.S.C. Sec. 656. Simply being a bank depositor is not enough. See Logsdon v. United States, 253 F.2d 12 (6th Cir.1958). It is clear from the transcript that Cantrell was not an employee or director of the bank, or even a majority stockholder. Cantrell could come within the statute, however, if he was a de facto officer of the bank, pulling the bank's financial strings from outside the official organizational structure.
 
 
 15
 Mrs. Phoebe Frazier, vice-president and cashier of the bank, testified at trial that she heard Cantrell announce around March of 1982 that "he did not have anything to do with the bank after that." But Walter Spiva, the president of the bank and its de jure decision-maker, testified that Cantrell was giving the orders at the bank long after March 1982. There was considerable evidence that Cantrell did, in fact, call the shots at the bank, and the trial court was not required to find otherwise.
 
 III
 
 16
 Whether the evidence was sufficient to support a conviction for misapplication of funds by the de facto officer is a more tangled issue. "Willful misapplication "is not defined in the statute. One frequently cited opinion dealing with willful misapplication, United States v. Gens, 493 F.2d 216 (1st Cir.1974), divides the misapplication cases into three categories:
 
 
 17
 "First, those in which bank officials knew the named debtor was either fictitious or wholly unaware that his name was being used ... Second, cases in which bank officials knew the named debtor was financially incapable of repaying the loan whose proceeds he passed on to the third party ... Third, cases in which bank officials assured the named debtor, regardless of his financial capabilities, that they would look for repayment only to the third party who actually received the loan proceeds: in other words where the debtor allowed only his name to be used, enabling the bank officials to grant a de facto loan to a third party to whom the bank was unwilling to grant a formal loan."
 
 
 18
 493 F.2d at 222; see also United States v. Foster, 566 F.2d 1045 (6th Cir.1977) (applying Gens ).
 
 
 19
 United States v. Duncan, 598 F.2d 839 (4th Cir.1979), defined a Sec. 656 violation in terms of the following elements:
 
 
 20
 "For a violation of Sec. 656 to be proved, the government must show, in addition to the status of both bank and defendant, that the defendant acted willfully, that he misapplied funds, moneys or credits belonging to or entrusted to the custody of the bank and that he did so with the intent to injure or defraud the bank. While the statutory language no longer makes reference to the last mentioned element, it remains a necessary part of the government's proof."
 
 
 21
 598 F.2d at 858.
 
 
 22
 All of the elements of a Sec. 656 violation are present, as the jury could well have found, in the case at bar. Cantrell told Spiva, the president of the Dayton Bank, that although McGee's present financial status was insufficient to support a loan of the magnitude of $412,000, McGee's income would soon almost triple. This was not true. McGee testified at trial that he had no reason to expect a major increase in his income, and he said that he would not have been able to pay off the $412,000 note without Cantrell's assistance. Whether or not Cantrell knew that he was telling Spiva an untruth is, of course, a factual determination for the jury; but there was no effective rebutal of Spiva's testimony, or McGee's. Moreover, according to Spiva, the board of directors was never informed that Cantrell had an interest in the loan to McGee.
 
 
 23
 The evidence shows that Cantrell obtained the $412,000 loan for McGee in the expectation of gaining personal advantage from it. According to McGee's testimony, Cantrell had McGee sign an agreement under which McGee would be obligated to sell the Farmbanc stock to Cantrell at the original purchase price if Cantrell paid off McGee's indebtedness. In return, Cantrell gave McGee a demand note for $412,000 with a "verbal understanding" that if the bank called its note, McGee could call his. That the stock purchase option was never exercised is of no moment. It is not necessary, in showing misapplication of funds, to prove actual gain by the defendant or actual loss by the bank. "It is sufficient that the defendant at least temporarily deprive the bank of the possession, control or use of its funds." Duncan, 598 F.2d at 858.
 
 
 24
 The jury could well have found that Cantrell (a) had the Dayton Bank make a loan to a person who was financially incapable of repaying it; (b) for the purpose of having that person buy stock which Cantrell would have an option to purchase; (c) without informing the Dayton Bank of his interest in the loan. Under any reasonable construction, this constitutes misapplication of funds under Sec. 656.
 
 
 25
 Defendant Cantrell made little attempt to rebut the evidence against him. He called only one witness, Millard Oakley, the man from whom the 10,000 shares of Farmbanc stock had been purchased. Oakley testified, basically, that it was he who sold the stock and that he, not McGee or Cantrell, ultimately pocketed the $412,000. That fact hardly helps Cantrell, however, because Cantrell put himself in a position to acquire the stock. Neither is Cantrell helped by the fact that the Dayton Bank got its $412,000 back, with interest, assuming that this is true. What matters is the risk of loss that was imposed on the bank during the period when the loan was outstanding, and the loss of the opportunity to lend the money to more credit-worthy borrowers. Although the Bank of Cumming took a 90 percent participation in the loan, it was not obligated to do so--and the Dayton Bank was still left with a $40,000 exposure. Defendant's argument that the loan was "risk-free" is not helped by the fact that the Cumming Bank "charged off" half of its share of the loan--meaning, in the words of government witness John Mitchell, that "the bank considers it to be of such doubtful collectability that it should no longer be carried in their assets." And it should be noted that although McGee testified that Cantrell paid off the loan, there is evidence in the record that the loan was in fact charged off by the Dayton Bank & Trust as uncollectible, as well.
 
 
 26
 We think there was substantial evidence to support the conclusion that this case falls in Gens' second category of misallocation, where "bank officials [i.e., Cantrell] knew the named debtor was financially incapable of repaying the loan whose proceeds he passed on to the third party [i.e., Cantrell]." There was also substantial evidence showing willfulness and intent to defraud.
 
 IV
 
 27
 Cantrell contends that the indictment was unconstitutionally vague because it characterized him as "in fact an officer of Dayton Bank and Trust Company" as well as "a de facto officer of said bank." Cantrell maintains that the government was trying to use two theories without having to choose between them. The argument is creative but unpersuasive. It is clear from a reading of the indictment that "in fact" was used as a synonym for de facto.
 
 
 28
 Cantrell also argues that the indictment was unconstitutionally vague because it failed to discriminate between misapplying funds directly, misapplying funds through the agency of another person, and misapplying funds by aiding and abetting another in doing so. The statute does not so discriminate, however, and the indictment was not deficient.
 
 
 29
 Cantrell argues that the court's charge to the jury gave improper examples of misapplication of funds. Of the three examples given, the first two were taken almost verbatim from the second and third examples in Gens. The third example departed from Gens:
 
 
 30
 "Third, the bank officer or person connected in some capacity with the bank makes a loan to a named debtor, McGhee, with the intent that the proceeds be used for his own benefit and conceals his interest in the loan from the bank. In such a case, the financial condition of the nominal borrower, McGhee, is not relevant.
 
 
 31
 However, where the bank officer or person connected in some capacity with the bank derives no benefit from the loan, he may properly loan money to a named debtor, McGhee, whom the bank officer or person connected with the bank in some capacity knows will reloan the money if the named debtor, McGhee, is creditworthy and understands that he is responsible to repay the loan.
 
 
 32
 In this situation, the bank official or person connected in some capacity with the bank has granted a loan to a financially []capable party who knows his obligation to repay the loan and thus has protected the interests of the bank."
 
 
 33
 Cantrell contends that this example was prejudicial because it characterized McGee as a "nominal borrower." Cantrell made no specific objection on this ground at the charge conference, however, and thus waived any right to complain of the phrase here, absent plain error affecting his substantial rights. United States v. Bouquett, 820 F.2d 165, 170 (6th Cir.1987); see also United States v. Saussy, 802 F.2d 849, 853 (6th Cir.1986); cert. denied, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987). No such error existed.
 
 
 34
 Cantrell also contends that the third example of misapplication was unfairly prejudicial because it deviated from established court interpretations of 18 U.S.C. Sec. 656, such as those made in Gens and in United States v. Foster, 566 F.2d 1045 (6th Cir.1977). But while perhaps not congruent with the examples in Gens, the third example does in fact describe a "nominee loan." In all of the examples in Gens, a bank official had used a named debtor to lend to a third party; here, the allegation was that the bank official had used the named debtor to lend to himself. If the unauthorized lending to a third party in the Gens examples is forbidden by the statute, then certainly the unauthorized lending to oneself is forbidden also.
 
 
 35
 We have carefully examined the remaining objections to the charge, not all of which were made known to the trial court, and we do not find that the court committed any error that would justify setting the conviction aside. The judgment of the district court is AFFIRMED.