William Michael LOVERN, Petitioner,

v.

UNITED STATES of America, Respondent.

Kenneth Glen LUKE, Petitioner,

v.

UNITED STATES of America, Respondent.

Crim. Nos. 82–00023–01–R, 82–00023–02–R.
Civ. A. Nos. 86–0294–R, 87–0416–R.

United States District Court, E.D. Virginia.

June 22, 1988.

S. Keith Barker, Richmond, Va., for Lovern.

Kenneth Glen Luke, Rex, Ga., pro se.

Robert W. Jaspen, Asst. U.S. Atty., Richmond, Va., for U.S.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

In this Section 2255 case,[1] petitioners challenge their convictions for misapplication of bank funds and related offenses, 701 F.2d 1104, on the grounds that (i) the government failed to produce certain documents to the defense prior to and during trial, in violation of 18 U.S.C. § 3500 (the Jencks Act) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and (ii) their counsel rendered them constitutionally defective representation.[2] Petitioner Luke also argues that his counsel's performance was so inadequate that it constituted ineffective assistance of counsel as a matter of law, as well as an independent violation of his Fifth and Sixth Amendment rights. After a full evidentiary hearing and a comprehensive review of the entire record, the Court is compelled to conclude that petitioners are not entitled to relief. Although the Court finds that the government did fail to comply with the Jencks Act and *Brady v. Maryland* with regard to certain documents, these errors did not prejudice the defense and do not undermine confidence in the result reached by the jury. Further, under the analysis articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the performance of petitioners' counsel does not warrant relief. Petitioners have not demonstrated that counsel's performance fell outside the "wide range of reasonable professional assistance" and that they suffered prejudice because of any of the alleged deficiencies. *Id.* at 689, 694, 104 S.Ct. at 2065, 2068.

### Background[3]

#### A. The 1982 Proceedings

In February, 1982, petitioners Luke and Lovern were jointly indicted for (1) conspiracy to misapply bank funds and to make a false entry in bank records, 18 U.S.C. §§ 2, 371, 656, 1005; (2) aiding, abetting and causing the making of a false entry in bank records, 18 U.S.C. §§ 2, 1005; and (3) aiding, abetting and causing a misapplication of bank funds, 18 U.S.C. §§ 2, 656. A jury trial was held on May 12 and 13, 1982 and resulted in convictions of petitioners on all counts.

The charges against petitioners focused on their dealings with Charles P. Sheehy, an assistant vice president of Central Fidelity Bank (formerly Central National Bank) in Richmond, Virginia. Sheehy's duties included the approval and management of loans. His lending limit was $50,000 for each individual, plus an additional $50,000 if the individual owned a company and the corporate debt was independently secured. From the spring of 1978 until September, 1979, Sheehy was the bank officer who handled loans to petitioners and to certain carpet companies they controlled. Sheehy, who was the government's principal witness at trial and who earlier had pleaded guilty to making a false entry in bank records, testified that by the end of May, 1979, he had loaned Luke and Lovern and their related companies $122,000. Thus, by May, 1979, the bank's loans to petitioners exceeded Sheehy's loan limit. Petitioners' loans also had a history of being past due.

Sheehy had also exceeded his lending authority with respect to loans made to another borrower, Mastertrax, Inc., a recording company established by Rodney Seagream. In June, 1979, bank officials were under the impression that Sheehy had loaned only $75,000 to Mastertrax and Rodney Seagream. In fact, Sheehy had approved loans to Mastertrax, Rodney Seagream and related entities totalling approxi-

---

1. 28 U.S.C. § 2255.

2. Petitioners were jointly indicted and tried. They asserted common defenses. Thus, many of the issues raised in the petitioners' Section

2255 motions are identical. Accordingly, this opinion addresses the claims of both petitioners.

3. The facts recited here are those found by the Court pursuant to Rule 52, Fed.R.Civ.P.

mately $271,000. Even the $75,000 sum, however, exceeded Sheehy's loan limit. Not surprisingly, therefore, Sheehy was summoned before the bank's loan review committee and was informed that the Mastertrax debt, which they assumed was only $75,000, exceeded his lending authority and that the committee considered the Mastertrax loans very risky. Sheehy assured his immediate supervisor, William Pruitt, that Mastertrax was anticipating the prompt sale of a record and, as a result, $30,000 of the debt would be liquidated within two to four weeks.

After the bank's discovery of the Mastertrax problem, Sheehy met with Luke and Lovern in his office. Luke and Lovern noticed that Sheehy seemed upset and asked the reason. Sheehy told them the Mastertrax loan was at risk and asked for their help. Specifically, he asked that they speak to Rodney Seagream to underscore the importance of Mastertrax paying the debt promptly. Sheehy had introduced petitioners to Seagream earlier that spring in the hope that they would offer Seagream their marketing assistance on the record project.

At a subsequent meeting with Sheehy on June 19, petitioners again expressed concern that Sheehy appeared upset. Sheehy responded that the Mastertrax situation was deteriorating rapidly. The prospect of Sheehy failing to salvage the Mastertrax loan was singularly unappealing to petitioners. They had a strong interest in Sheehy's continued employment with the bank because Sheehy had also exceeded his loan limit for them and because they viewed him as an important source of future loan funds. Understandably, therefore, petitioners then offered Sheehy their assistance.

In response, Sheehy proposed a scheme whereby the Mastertrax debt would be paid with loan funds funneled through the petitioners and their entities. Specifically, the plan involved lending money to one of petitioner's corporations, but depositing the proceeds into Luke's personal savings account and then debiting that savings ac-

count to reduce the Mastertrax debt. Petitioners' Sun Carpet Co. was nominated as the company which would, on paper, receive the loan. When Mastertrax actually repaid the loan, the money would be remitted to Sun Carpet Co. Rodney Seagream was not to know the source of the money used to pay the Mastertrax loan. In effect, therefore, petitioners agreed to help Sheehy in a fraudulent scheme designed to conceal the true borrower and, ultimately, the full extent of the Mastertrax debt.

The scheme was implemented. Bank documents reflect (i) that Luke signed a note on behalf of Sun Carpet Co. for a $30,000 loan which Sheehy arranged and approved, (ii) that on June 20, 1979, one day later, $30,000 was credited to Luke's personal savings account and (iii) that on June 21, Sheehy debited Luke's savings account to reduce Mastertrax's debt by $30,000. Significantly, from the time of these events until he left the bank on September 7, 1979, Sheehy loaned petitioners' companies an additional $50,000. As of October, 1979, petitioners and their companies owed the bank $196,000. Thus Sheehy, with the active cooperation of petitioners, was able to conceal from the bank the true extent of the Mastertrax loans and the source of the partial repayment, as well as the true extent of loans to petitioners.

Sheehy's testimony about the fraudulent scheme was corroborated by the testimony of Rodney Seagream, who pleaded guilty to misrepresentation of information on a loan application. According to Seagream, Lovern contacted him on June 18, 1979 and asked that Seagream meet him later that day at a McDonald's restaurant. The topic of conversation during the meeting, at which Luke was also present, was Mastertrax's precarious financial condition and its potential effect on Sheehy's position at the bank. In this connection, Lovern stated that Sheehy's position at the bank was "very important to several south side Richmond businessmen,"[4] including the petitioners. Lovern then advised Seagream not to be "a bit surprised if you should wake up one morning and [find that] your

---

**4.** Transcript of 1982 Criminal Trial [hereinafter       "Trial Tr."], at 111.

loans have been liquidated with Central National Bank. You won't know who or why they were liquidated, but you may find a receipt in the mail indicating that they had been indeed paid in full." [5]

Seagream did not learn until September, 1979 that the Mastertrax loan had been partially paid. Until that time, Seagream testified that he had never heard of Sun Carpet Co. Thereafter, in October of 1979, Seagream received a call from Lovern, during which Lovern reported that he had paid the Mastertrax loan and that he, Lovern, was supposed to be repaid. This testimony, together with the other evidence summarized above, manifestly supported the government's theory of the case, namely that Sheehy was a goose laying golden eggs for petitioners. Petitioners therefore had an interest in fraudulently concealing the true extent of the loans to Mastertrax and themselves to ensure Sheehy's continued employment as a loan officer at the bank.

The defense attempted to convince the jury that Sun Carpet Co. was a legitimate enterprise and that petitioners did not have prior knowledge that the loan to Sun Carpet would be used to pay the Mastertrax debt. Alternatively, the defense argued that even if petitioners had knowledge of the Sun Carpet Co. transaction, the transaction was not illegal because petitioners intended to remain liable on the Sun Carpet Co. note in the event that Mastertrax failed to repay its loan. In support of the first theory, the defense presented testimony indicating that the concept for Sun Carpet Co. had been in existence since early 1978. Further, Luke testified that he and Lovern were not aware of, nor did they approve, the use of the Sun Carpet Co. loan to pay the Mastertrax debt. Luke stated that, in fact, he asked for only $20,000 for Sun Carpet Co. and told Sheehy that he did not need the money until the fall of 1979. Luke stated that Sheehy, nevertheless, insisted on loaning Sun Carpet $31,000 on June 19, explaining to Luke that the money was available then, but might not be avail-

able in the fall. About thirty days later, according to Luke, he and Lovern realized that the loan proceeds were not in Luke's personal savings account. When confronted, Sheehy allegedly told petitioners that there had been a computer error, but later conceded the money had been used to pay the Mastertrax debt.

According to Luke, after Sheehy had left the bank, petitioners complained to bank officials that money had been removed from Luke's account without authorization and that Luke had not been receiving his savings account statements. The defense also presented testimony that petitioners had been to an attorney, Joseph Blackburn, probably in October, 1979, to seek advice about the allegedly unauthorized removal of funds from Luke's account.

Predictably, the defense attempted to discredit the testimony of Sheehy and Seagream. The defense elicited from Sheehy the fact that he had pleaded guilty to one felony in return for the government's agreement to withdraw three other charges. Sheehy also admitted that (i) he had lied to, and concealed important information from, his superiors, (ii) he had violated his duty to the bank, (iii) during the spring and summer of 1979, he would have done almost anything to save himself, (iv) he had spoken to petitioners about imaginary friends as if they were real people, (v) he had been under psychiatric care for nine months, and (vi) mentally, he was "very close to the edge" [6] in September, 1979. As for Seagream, on cross examination he stated that he had misrepresented the value of his assets to the bank and that he had also made false statements to a loan officer at Virginia National Bank. As the trial record reflects, even Sheehy had previously characterized Seagream as being full of "[c]onstant lies, unrealistic attitudes, and large quantities ... [of b]ullshit." [7] The defense also contended during closing argument that even if Sheehy's and Seag-

---

5. Trial Tr., at 111.

6. Trial Tr., at 91.

7. Trial Tr., at 41.

ream's testimony were believed, petitioners' actions were not unlawful because they never intended to defraud the bank.

The jury ultimately accepted the government's version of the events, and petitioners were found guilty on all counts.[8] On direct appeal, the Fourth Circuit found that the evidence was sufficient to sustain petitioners' convictions. *United States v. Luke*, 701 F.2d 1104 (1983). The court rejected the argument that the loan to Sun Carpet Co. and subsequent application of the proceeds to pay the Mastertrax debt could be viewed as a legitimate transaction. Instead, by allowing their names to be used to enable Sheehy to grant a de facto loan to Mastertrax, petitioners had aided and abetted a willful misapplication of the bank's funds and the making of a false entry in bank records with intent to defraud the bank. *Id.* at 1107–08; *see also* 18 U.S.C. §§ 656, 1005. According to the court:

> [T]he note from Sun Carpet was deceptive. By resorting to it, bank management, public officers, and others would have been unable to obtain a true picture of the bank's condition.

*Luke*, 701 F.2d at 1108 n. 7 (citation omitted).

B. The Section 2255 Proceedings

Petitioners attack their convictions on several grounds. Their primary argument is that the government failed to turn over *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963), and Jencks Act material to the defense.[9] Petitioners also contend that their counsel rendered them ineffective as-

sistance. Finally, Luke argues that his counsel's reference at trial to his silence during the investigation and his reliance on the Fifth Amendment with respect to certain documents during the grand jury proceedings violated his Fifth and Sixth Amendment rights.[10]

Petitioners filed their Section 2255 petitions in 1986 and 1987, respectively. The Court held a pretrial conference and heard argument on Luke's motion for summary judgment on November 12, 1987. All parties filed pre-trial briefs, and a full hearing on the merits was held on December 1, 1987. At the hearing, the Court heard testimony and argument concerning the errors that allegedly occurred at petitioners' criminal trial. The following witnesses testified: (i) John Barr, Sheehy's counsel before and during petitioners' criminal trial, (ii) Robert P. Geary, co-counsel for Lovern during the criminal trial, (iii) William H. Pruitt, an employee of Central Fidelity Bank, (iv) Charles Sheehy, (v) Thomas O'Donnell, an FBI agent who had reviewed the government's files pertaining to petitioners, and (vi) Luke. The Court allowed the taking of Rodney Seagream's deposition after trial, and the parties then submitted post-trial briefs.

Set forth below is a brief catalogue of petitioners' claims. The Court's further factual findings and analyses pertaining to petitioners' contentions are included in the "Analysis" section of this Opinion.

---

**8.** Petitioners received suspended sentences on all counts and were placed on probation for five years.

**9.** Under *Brady* and its progeny, the government must disclose to an accused favorable evidence bearing on either guilt or punishment. 373 U.S. at 85, 87, 83 S.Ct. at 1195, 1197. The Jencks Act requires the government, on motion of the defendant, to produce certain statements of a witness after the witness has testified for the United States on direct examination. 18 U.S.C. § 3500.

**10.** Petitioners' section 2255 motions also allege prosecutorial misconduct before the grand jury

and presentation of untruthful evidence to the grand jury as grounds for overturning their convictions. These issues are discussed in connection with trial counsel's failure to move to quash the indictment. *See infra* note 48. Luke further claims in his petition that the prosecution was guilty of misconduct at trial because it failed to disclose prior statements of a witness, incorrectly represented that Sheehy had signed a statement relating to the events at issue and questioned Luke on cross-examination about documents not produced before the grand jury. These claims are addressed in connection with the analysis of the alleged *Brady* and Jencks Act violations and Luke's motion for summary judgment. *See infra* pp. 579–581, notes 42, 43.

1. *Government's Failure to Produce Documents* [11]

Petitioners' claims concern three categories of documents. The first category consists of nondisclosed documents which the Court finds are Jencks Act material, *Brady* material or both. These documents are:

a. 1980 Deposition of Rodney Seagream

b. Letter from Sheehy to David Fairchild

c. Interview Form of Nancy Harrison

d. Interview Form of William Pruitt

e. Seagream's Handwritten Notes

The second category consists of those documents the Court finds are not within the Jencks Act or *Brady.* They are:

a. Letters from Charles Sheehy to Eugene Grevenberge and Don Drossell

b. Interview Form of Jennifer Trent

c. Loan Memoranda

d. Walter Paulette Work Paper

e. Performance Evaluation of Charles Sheehy

The final category is comprised of one document the Court finds never existed, namely a formal, signed statement of Sheehy relating to the events at issue in petitioners' criminal trial.

2. *Ineffective Assistance of Counsel*

Petitioners' second ground for reversal of their convictions is that trial counsel made a number of errors which cast doubt on the reliability of the jury's verdict. At trial, Lovern was represented by James M. Hooker, Esq. Hooker asked Robert P. Geary, Esq., to assist in the defense. Geary was to prepare pretrial motions, perform research and serve as a consultant regarding trial strategy. Luke's counsel was Harvey Goodman, Esq. Hooker explained in a deposition taken in connection with the section 2255 proceeding that he joined with Geary and Goodman to launch a joint defense against the allegations of the indictment. Petitioners allege that this effort was constitutionally defective in the following respects: [12]

a. Failure to Investigate and Interview Witnesses

b. Failure to File Brady and Jencks Act Motions

c. Failure to Move to Quash the Grand Jury Indictment

d. Failure to Subpoena Bank Records and to Move to Inspect Bank Records in the Custody of the Government

3. *Luke's Motion for Summary Judgment*

Luke argues that his counsel rendered ineffective assistance as a matter of law because counsel, in the jury's presence, (1) asked FBI Agent Crump questions about Luke's refusal to be interviewed before consultation with his attorney and his silence during the investigation, and (2) stated during cross-examination of Luke that Luke had taken the Fifth Amendment with regard to production of corporate records. According to Luke, these statements also amount to independent violations of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel.[13]

**11.** Prior to the criminal trial, Luke's counsel filed motions for production of *Brady* and Jencks Act material, and the government stipulated that, although Lovern's counsel did not file discovery motions, the United States intended to produce to Lovern's counsel all documents it considered to be *Brady* or Jencks Act material.

**12.** Petitioners' additional claims of ineffective assistance are discussed in the Analysis section of this Opinion. *See infra* pp. 592–593.

**13.** Luke apparently conceded at one point in his supplemental memorandum in support of summary judgment that counsel's questioning of FBI Agent Crump was not an independent violation of his constitutional rights. Because it is not clear, however, whether Luke intended to concede this point, the Court will assume for purposes of the motion that Luke continues to maintain that this line of questioning infringed his Fifth and Sixth Amendment rights.

*Analysis* [14]

### A. The Government's Failure to Produce Documents

1. *Standard to be Applied in Assessing Alleged Violations of Brady v. Maryland*

■ In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that due process requires the government to disclose to the defense evidence which is exculpatory and material to either guilt or punishment. *Id.* at 87, 83 S.Ct. at 1197. The rule covers impeachment, as well as exculpatory, evidence. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The standard to apply in evaluating whether the government's failure to produce documents pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), warrants overturning petitioners' convictions is well-established. Evidence is considered material, and relief is therefore appropriate, if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed. 2d 481 (1985); *see also Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1985); *United States v. Alexander*, 789 F.2d 1046, 1050 (4th Cir. 1986) ("[a] failure to demonstrate a possible effect on the trial outcome makes the government's failure to produce evidence harmless").

2. *Standard to be Applied in Assessing Alleged Jencks Act Violations*

■ The proper test for assessing the significance of Jencks Act violations is not as easily discerned. Prior to the Supreme Court's *Bagley* decision, the Fourth Circuit applied a harmless error standard favorable to defendants. In *United States v.*

*Snow*, 537 F.2d 1166 (1976), the court stated:

> The purpose of the Jencks Act is to make any existing prior statement of a government witness concerning matters covered by direct examination equally available to the defense and the prosecution.... Since it is ordinarily difficult upon a cold record to ascertain the value to the defense of a statement withheld, violation of the Act *should be excused only where it is perfectly clear that the defense was not prejudiced by the omission.*

*Id.* at 1168 (citations omitted) (emphasis added). The court made clear, however, that the defendant must make some showing of prejudice to avoid a finding of harmless error.

The Fourth Circuit's "perfectly clear" test was soon reinforced by a footnote in *Goldberg v. United States*, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976). There, the Supreme Court, presented with a question regarding the scope of the Jencks Act, admonished that "[s]ince courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial ... the harmless-error doctrine must be strictly applied in Jencks Act cases." *Id.* at 111 n. 21, 96 S.Ct. at 1348–49 n. 21 (citations omitted) (quoting *Clancy v. United States*, 365 U.S. 312, 316, 81 S.Ct. 645, 647, 5 L.Ed.2d 574 (1961)); *see also United States v. Troung Dinh Hung*, 629 F.2d 908, 921 n. 12 (4th Cir.1980); *cert. denied*, 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982); *United States v. Crowell*, 586 F.2d 1020, 1028 (4th Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979).

The government urges this Court to read *Bagley* as implicitly modifying the Fourth Circuit's "perfectly clear" standard, thereby imposing a greater burden on defendants to show reversible error. In support of this argument, the government cites *United States v. Schell*, 775 F.2d 559 (4th Cir.1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 898 (1986), a case decided after *Bagley*. Although *Schell*

---

**14.** Facts found in connection with this analysis are findings of the Court pursuant to Rule 52,   Fed.R.Civ.P.

cites *United States v. Crowell*, which applies the "perfectly clear" standard, the *Schell* formulation of the harmless error test is somewhat different from that of the court's previous opinions. According to the *Schell* court, "Jencks Act violations constitute harmless error when they result in no prejudice to the defense." *Id.* at 567. The government contends that the "no prejudice" language should be read harmoniously with *Bagley* to require the defendant to show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481.

A close reading of *Schell*, however, militates against the conclusion that the Fourth Circuit intended to import *Bagley* into the Jencks Act context. After its discussion of the alleged Jencks Act violation, the *Schell* court, citing *Bagley*, found that alleged *Brady* violations did not require reversal of defendants' convictions. The court stated that disclosure of the documents at issue "would not have affected the outcome of the trial." *Schell*, 775 F.2d at 568. Implicitly, therefore, the court drew a distinction between the standard applicable to Jencks Act violations and that applicable to *Brady* violations. *See United States v. McKenzie*, 768 F.2d 602, 609 (5th Cir.1985) (post-*Bagley* decision stating that a 'scrupulous' standard of harmless error applies to Jencks Act violations), *cert. denied*, 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed. 2d 900 (1986).

The government argues that it would be anomalous to place a greater burden on defendants to show prejudice stemming from constitutional violations than from statutory violations. *See United States v. Addonizio*, 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979) (the scope of collateral attack for non-constitutional violations is far more limited than that for constitutional violations). As petitioners point out, however, the Jencks Act imposes

specific obligations on the prosecution regarding certain statements. Moreover, had petitioners known of the existence of the documents at trial and had the government failed to produce them, petitioners could have moved to strike the witnesses' testimony or for a mistrial. 18 U.S.C. § 3500(d). No such specific guidelines govern production of *Brady* material. Thus, it is not necessarily anomalous to apply a more stringent harmless error standard in the Jencks Act context. *See United States v. Beasley*, 576 F.2d 626, 630 (5th Cir.1978) (recognizing that differing standards under *Brady* and Jencks Act may appear counter-intuitive, but justifying the difference on the ground that the statute is a "blanket disclosure requirement"), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).[15] Given the Fourth Circuit's decision in *Schell*, therefore, this Court must find that the Jencks Act violations resulted in "no prejudice" to conclude that nondisclosure was harmless error.

Under the standards of *Bagley* and *Schell*, the Court finds that any violations of *Brady* or the Jencks Act in this case were harmless error. The Court's findings of fact and analysis with respect to each document are set forth below.

### 3. Documents at Issue

#### a. 1980 Deposition of Rodney Seagream

On March 28, 1980, approximately two years before petitioners' criminal trial, the deposition of Rodney Seagream was taken in the case of *Central Fidelity Bank v. Rodney Seagream, et al.*, No. C. 80 247 (N.D. Ohio). The parties stipulated that the transcript was in the government's possession at the time of the criminal trial and that it should have been disclosed under the Jencks Act as a "statement" of a witness called to testify by the United States. 18 U.S.C. § 3500. According to petitioners, the deposition also constituted *Brady* material.

---

**15.** *See also United States v. McKenzie*, 768 F.2d 602, 609 (5th Cir.1985) (scrupulous standard applies to Jencks Act violations), *cert. denied*, 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986);

*Krilich v. United States*, 502 F.2d 680, 686 (7th Cir.1974) (Jencks Act violation requires reversal unless it is perfectly clear that the defense was not prejudiced).

Petitioners contend that they were prejudiced by the government's withholding of the deposition because it reflects Sheehy's *modus operandi* of manipulating loan funds without the borrower's knowledge. Thus, they claim it would have supported their theory at trial that Sheehy debited Luke's savings account to pay the Mastertrax loan without petitioners' authorization. In his 1980 deposition, Seagream was asked whether he had obtained proceeds from a loan secured by Don Drossell. Drossell was a business associate of Seagream's who had previously assisted Mastertrax in obtaining additional loans from the bank. Seagream testified that "some money [was] put into my account and transferred to New York that I ... was not fully aware of...." [16] This answer left ambiguous whether money deposited in Seagream's account was transferred to Drossell and what, if anything, Seagream knew about the transaction. Given this ambiguity, the Court allowed the parties to depose Seagream on this point following the habeas corpus hearing. In this most recent deposition, Seagream denied that funds deposited in his account were transferred to Drossell. Moreover, apart from Seagream's vague deposition testimony in 1980, there is no record or documentary evidence suggesting that such a transaction ever occurred.

Luke also points to a question asked by an attorney during the 1980 deposition which indicates that Sheehy used the proceeds of a loan obtained by Drossell to pay the Mastertrax debt without Seagream's knowledge.[17] In his later deposition, Seagream denied knowledge, obtained either before or after the transaction, that the transaction had occurred. Again, no documentary or other evidence supports Luke's contention that Sheehy performed such a transaction. This contention rests, at base, only on a lawyer's question, not on any real evidence.[18]

16. Petitioners' Exhibit [hereinafter "Petitioners' Exh."] 6, at 26. (All references to exhibit numbers pertain to exhibits presented at the habeas corpus hearing.)

17. The following exchange occurred:

Q [by counsel for plaintiff] [W]ere you aware that $12,000 of the proceeds from [a loan obtained by Drossell] were used to curtail indebtedness of Mastertrax to Central National Bank?

A [Seagream] No.

Petitioners' Exh. 6, at 34.

18. Petitioners cite a number of other portions of Seagream's deposition which they claim would have been useful to the defense. None of this material warrants reversal of the convictions. Lovern argues that the deposition would have supported his claim that he was not interested in helping Mastertrax. Seagream explained in 1980 that Lovern expressed little interest in investing in or promoting Mastertrax, despite Sheehy's prodding. But Seagream's comments concerning Lovern's unwillingness to invest in Mastertrax would not have aided the defense. The government's theory was that Lovern was motivated not by a desire to help Mastertrax, but by a desire to insure that the goose laying golden eggs remained in the nest at the bank. When Sheehy in desperation proposed that Luke and Lovern cooperate in using the bank's funds to bail out Mastertrax, Lovern willingly accepted. The fact that Lovern had not previously agreed to use his own money or time to assist Mastertrax would have done nothing to undermine the government's theory. In any event, there was testimony at trial that Luke and Lovern, despite being asked, did not make a commitment to invest in or promote Mastertrax prior to the Sun Carpet Co. transaction.

Petitioners also claim that the deposition would have provided material relevant to Sheehy's and Seagream's credibility. Here again, relief is unwarranted. The deposition would not have provided impeachment material beyond that already available to petitioners at trial. With regard to Sheehy's credibility, petitioners point out that Seagream testified in 1980 that Sheehy devised means for hiding from bank officials the extent of Mastertrax's indebtedness. Petitioners overlook, however, that Sheehy admitted at trial that he had urged Seagream to find "investors" for Mastertrax and had then loaned the investors money which, in turn, was given to Mastertrax. He also admitted that he asked Seagream to supply him with a new corporate name under which he could loan Mastertrax more money. As to impeachment of Seagream, Seagream admitted at trial to making false financial statements to the bank and pleading guilty to a criminal charge for such conduct. The fact that he had denied these actions at his 1980 deposition, which was taken prior to his guilty plea, would have added nothing to the defense's argument that Seagream was a liar. *See United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir.1985) (nondisclosure of minor cumulative impeachment material, in violation of Jencks Act, is harmless error). Thus, nondisclosure of the deposition was harmless error under *Schell.*

Applying the *Schell* standard, the Court concludes that the deposition would not have assisted the defense at trial. The 1980 deposition testimony was simply too ambiguous to have been of any use to the defense in showing a pattern by Sheehy of manipulating funds without authorization. Seagream's most recent deposition makes clear that he had no knowledge that Sheehy either transferred funds from Seagream's account to Drossell or that Sheehy used the proceeds of a loan to Drossell to pay the Mastertrax debt. Thus, failure to produce Seagream's deposition constituted harmless error under the *Schell* test. For the same reasons, the deposition testimony cited by petitioners was not material to their guilt or innocence. Therefore, no relief is warranted with regard to the alleged *Brady* violation.[19]

### b. Letter from Sheehy to David Fairchild

■ At the time of the criminal trial, the government had in its possession, but did not provide to the defense, a two-page, handwritten letter from Sheehy to his friend, roommate and co-employee, David Fairchild.[20] The United States stipulated that the letter is a Jencks Act "statement" and that it was not produced. Written

shortly before Sheehy's resignation from the bank, the letter was attached to a longer, handwritten memorandum entitled "Summary of debt in the record situation." This memorandum was provided to the defense prior to the criminal trial. Only the cover letter, signed by Sheehy, was not produced. It is a confessional concerning Sheehy's mistakes at the bank and his mental state during the period in question. The letter also indicates that Sheehy believed at the time that he was a Vietnam War veteran. At trial, Sheehy admitted that he had never been in Vietnam.

Petitioners argue that nondisclosure of the Fairchild letter requires reversal under both the Jencks Act and *Brady*. According to petitioners, the letter would have provided a wealth of impeachment material. Allegedly, the letter indicates that Sheehy's mental condition at the time of the Sun Carpet Co. loan was far worse than alluded to at trial. Petitioners claim that questions based on the letter would have produced a significant negative impact on Sheehy's credibility. Because Sheehy's credibility was essential to the government's case, petitioners contend that withholding of the letter was not harmless error. The government responds that the

---

With regard to the alleged *Brady* violation, the deposition possessed no genuine exculpatory value. To the extent that the document contained impeachment material, it was cumulative. Accordingly, there is no reasonable probability that production of the document would have altered the result of the trial. *Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481.

19. In fact, as the government pointed out, the 1980 deposition contained some substantial inculpatory information. Seagream's deposition version of the telephone conversation with Lovern contained several harmful details not mentioned at trial. In the deposition, Seagream reported that Lovern stated that the Mastertrax debt had to be repaid because Fairchild was "'about to blow the cover.'" Petitioners' Exh. 6, at 89. Lovern allegedly stated that "'the [Mastertrax] note has been made whole to cover [Sheehy's] ass.'" *Id. See Magoon v. United States*, 787 F.2d 412, 414 (8th Cir.1986) (nondisclosure of information pertaining to undercover agent's delay in turning over cocaine to police, following a second purchase from defendant, was harmless error, because the jury would have learned that defendant had been involved in two cocaine transactions instead of one).

20. The letter states, in part:

[T]he attached pages [are] a complete summary of the loan situations which are problems....

... [W]hat you read on the following pages is a chronicle of my stupidity. I continued to lend money into what I knew to be adverse circumstances in the hopes that all would turn out.... I am embarrassed and tremendously upset over my lack of judgment on the one hand and integrity on the other.

... [T]he past 18 months for me have been characterized by a lack of sleep, a growing dependence on alcohol, a constant anxiety, and some severe physical problems.... I'm extremely tired and extremely depressed.

....

I apologize for not talking to you about Vietnam before I did, but what happened there had a profound affect [sic] upon me and I tried for years to cover it up. It was not a pleasant situation and certainly not one which I can ever try to repress again.

... I wanted you to know that I tried, but I paid the price, and that I realize the extent of my errors.

Petitioners' Exh. 8.

letter related to matters that were thoroughly explored at trial and was, at most, only cumulative.

The Court concludes that nondisclosure of the document did not prejudice the defense under either the Jencks Act or the *Brady* standard for harmless error. At trial, the jury was made aware that Sheehy had pleaded guilty to defrauding the bank. Additionally, the defense was successful in eliciting admissions from Sheehy that:

(i) he was depressed at the time in question because of problems at the bank and at home;[21]

(ii) he was in a panic situation and would have done almost anything to save himself;[22]

(iii) he had lied to people at the bank, including his superiors;[23]

(iv) he had hidden the extent of Mastertrax's indebtedness to protect himself;[24]

(v) he had failed in his responsibility as a banker;[25]

(vi) he had attempted to persuade Fairchild to aid him in hiding his malfeasance from the bank;[26]

(vii) he had fantasized about having friends who had been in the Vietnam War;[27] and

(viii) he had been under psychiatric care for nine months.[28]

Moreover, on redirect examination, Sheehy confessed that he was very weak physically and was mentally "very close to the edge" prior to his resignation from the bank.[29] During closing argument, defense counsel stated that Sheehy had told the jury that he was "panicky. He told you he was in a great depressed state. He told you he was fantasizing. Fantasizing. He told you eventually he had to go into psychiatric . . .

care."[30] Counsel also repeatedly pointed out that Sheehy was a confessed liar.[31]

Thus, the defense successfully extracted from Sheehy admissions concerning all grounds for impeachment contained in the Fairchild letter. *Cf. United States v. Beasley*, 576 F.2d 626, 632–33 (5th Cir.1978) (nondisclosure of Jencks Act statements required vacation of conviction where trial testimony differed in important respects from prior statements). The jury was informed through Sheehy's own statements that he had mental problems and was fantasizing during the time in question and that he had used extremely poor judgment. All this is in sharp contrast to a situation in which an undisclosed document conveys some new or significant impeachment material. *Cf. United States v. Pacelli*, 491 F.2d 1108, 1119 (2d Cir.1974) (conviction reversed where impeachment material used at trial did not convey desperate state of key witness' mind as forcefully as did a letter written by witness to United States attorney), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974). The Court finds that, as in *United States v. Crowell*, 586 F.2d 1020 (4th Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979), Sheehy's credibility was "thoroughly impeached so that any additional attack would have been to little purpose." *Id.* at 1028.

Despite the extensive impeachment, the jury must have believed that Sheehy, three years after the events in question, was able at trial to distinguish fact from fiction with respect to the crucial issue, namely petitioners' involvement in the Sun Carpet Co. transaction. The jury's decision to believe Sheehy was likely based on the candor and contrition evident from his testimony, as compared with the contrived, strained, and

21. Trial Tr., at 47.

22. Trial Tr., at 47–48.

23. Trial Tr., at 31–31, 47–50.

24. Trial Tr., at 31.

25. Trial Tr., at 35.

26. Trial Tr., at 32.

27. Trial Tr., 51.

28. Trial Tr., at 52.

29. Trial Tr., at 91.

30. Transcript of Closing Arguments, at 21.

31. Transcript of Closing Arguments, at 20, 29, 30.

at times evasive nature of Luke's testimony. As a result of the Section 2255 hearing, this Court reached the same conclusion with respect to Sheehy's credibility as did the jury. The Court was struck by Sheehy's candor and forthrightness in discussing the events of 1979. Sheehy's testimony was consistent, his demeanor calm and contrite and his testimony ultimately persuasive. He seemed entirely at peace with his past mistakes and criminal conduct.

Also important to the Court's finding of harmless error is the fact that Sheehy's testimony as to petitioners' participation was substantially corroborated. *See United States v. Alexander*, 789 F.2d 1046, 1050 (4th Cir.1986); *Crowell*, 586 F.2d 1020, 1028; *cf. United States v. Badalamente*, 507 F.2d 12, 18 (2d Cir.1974) (nondisclosure of witness' prior Jencks Act statements required a new trial where witness' testimony was crucial to a determination of guilt or innocence), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975); *United States v. Sperling*, 506 F.2d 1323, 1337–1339 (2d Cir.1974) (upholding convictions of certain defendants despite violation of Jencks Act where substantial, independent and corroborating evidence linked defendants to the crime), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed. 2d 439 (1975) *and* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975). Seagream's testimony made clear that petitioners authorized the Sun Carpet Co. transaction to preserve the goose laying golden eggs. Further, petitioners' continued receipt of loans after the Sun Carpet transaction did much to discredit their claim that Sheehy manipulated the funds in Luke's account without their knowledge. Applying either the strict standard for harmless error under the Jencks Act or the more lenient standard for *Brady* violations, the Court finds that nondisclosure of the Fairchild letter did not prejudice the defense and does not warrant habeas relief.

Petitioners ask the Court to infer from the circumstances that the prosecution intentionally withheld the letter to Fairchild and to sanction the government by vacating the convictions. The law, however, is to the contrary. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court, in evaluating whether a *Brady* violation required reversal of a conviction, stated:

> [W]e [do not] believe the constitutional obligation is measured by the moral culpability, or the willfulness of the prosecutor.... If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.

*Id.* at 110, 96 S.Ct. at 2400; *see also Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963); *United States v. Page*, 828 F.2d 1476, 1480 (10th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). The same rule should apply to Jencks Act violations: it is the nature of the evidence withheld rather than the nature of the prosecutor's conduct which determines whether the defense suffered prejudice sufficient to require relief. *See United States v. McKenzie*, 768 F.2d 602, 609 (5th Cir.1985) (only results, not motive of prosecutor, are relevant in determining whether violation of Jencks Act requires reversal). The Court therefore declines petitioners' invitation to overturn their convictions on this ground. *See infra* note 57.

c. Interview Form of Nancy Harrison

This document is a typewritten report of an interview conducted on December 9, 1980 by FBI Agent Crump.[32] Harrison was a commercial loan officer at Central Fidelity Bank, a position directly below Sheehy's in the bank hierarchy. Harrison stated to Crump that beginning in 1979, Sheehy frequently complained that Seagream was a problem account, that Sheehy began to act in a " 'bizarre' " manner in the spring of 1979, that Sheehy told her he could not "pull the loans out himself" but

**32.** The government stipulated that if Harrison had been called at petitioners' criminal trial, she would have testified to the information contained in the interview form. Transcript of December 1, 1987 Habeas Corpus Proceedings [hereinafter "Habeas Corpus Tr."], at 18.

would not allow them to go bad, that Sheehy lied to his supervisor, Bill Pruitt, when asked whether Wheels Co. was related to a recording group named "Bull" and that Sheehy told her he had been on a secret mission in Vietnam.[33] Petitioners contend that the report on Crump's interview of Harrison should have been produced under *Brady* because it contained impeachment material. The government responds that Harrison's testimony would have been cumulative and therefore that the government's failure to provide the interview form was harmless error.[34]

While the Court finds that the interview form should have been produced under *Brady* and *Giglio*, the Court agrees that nondisclosure was harmless error. Given the areas of impeachment the defense covered at trial and the independent corroborating evidence of petitioners' guilt, nondisclosure of the report does not undermine confidence in the convictions.

d. Interview Form of William Pruitt [35]

■ In May, 1980, William Pruitt, senior loan officer, advised Crump that he became aware in May and June, 1979 that Sheehy had not filed loan memoranda relating to the Mastertrax loans. The summary of the interview does not mention any delinquencies with respect to petitioners' loans. Pruitt also places the time of the meeting between Sheehy and his superiors regarding the Mastertrax situation at June 14 or 15, 1979. According to Pruitt, Sheehy told his superiors at that time that the loan would be repaid early in the following week. At the criminal trial, however, Sheehy testified the meeting occurred in late May. Finally, according to Pruitt, Sheehy stated prior to his resignation that he had been on a secret mission to Cambodia during the Vietnam War and that the mental trauma from this event was affecting his work.

Luke claims that nondisclosure of this document mandates relief under *Brady* and *Bagley* because it supports an infer-

ence that Sheehy filed the loan memoranda relating to petitioners' loans in a timely fashion and therefore that bank officials were aware of the extent of petitioners' indebtedness. Further, he contends that Pruitt's recollection of the date of the meeting between Sheehy and his superiors concerning the Mastertrax problem bolsters the argument that Sheehy panicked and debited Luke's account without authorization. . Moreover, he points to the reference to Vietnam as evidence of Sheehy's mental instability at the time in question. The government again responds that nonproduction of the report was harmless error.

The Court will assume that the report falls within *Brady* as exculpatory material. Even so, there is no reasonable probability that disclosure would have affected the verdict. Pruitt's failure to mention the loan memoranda relating to petitioners' debt during the interview is not inconsistent with his testimony at the section 2255 hearing that he did not in fact realize Sheehy had exceeded his lending authority with respect to petitioners until after Sheehy had resigned. As to the date of Sheehy's meeting with his superiors concerning the Mastertrax debt, Sheehy admitted at trial that he panicked when his superiors learned that he had exceeded his lending authority. The fact that Sheehy may have been given less time than he recalled to correct the situation is not significant. Finally, as discussed in connection with the Fairchild letter, evidence that Sheehy had fantasized about being in Vietnam would merely have been cumulative impeachment material. *See United States v. Crowell,* 586 F.2d 1020, 1028 (4th Cir.1978).

e. Seagream's Handwritten Notes

■ Luke points out that Seagream, in the deposition taken in connection with this proceeding, referred to certain handwritten notes he made while preparing to testify at petitioners' criminal trial. Seagream stated that he gave these notes to the prosecu-

---

**33.** Petitioners' Exh. 2.

**34.** The government did not contest that it possessed this document at the time of trial.

**35.** The government did not contest that it possessed Pruitt's interview form at the time of trial.

tor. Previously, Seagream had signed a formal statement relating to the events in question. This statement was provided to the defense. Apparently, the handwritten material consisted of brief notes written on a legal pad and related to the time at which events occurred. The government represented to the Court that no documents fitting this description exist in the government's files. Neither petitioners nor the government adduced any evidence concerning what became of the notes.

The Court will assume that Seagream's notes were Jencks Act statements which the government should have retained and produced to the defense. Even so, however, the government's failure to produce the notes does not automatically require reversal of the convictions. Rather,

> the appropriateness and extent of sanctions in such situations depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of [the document's] significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof.

*United States v. Grammatikos*, 633 F.2d 1013, 1019–20 (2d Cir.1980); *see also United States v. Amen*, 831 F.2d 373, 380 (2d Cir.1987) (same standard for loss of Fed.R. Crim.P. 16(a)(1)(A) material), *cert. denied*, — U.S. —, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988).

Here, there is no evidence that the loss or destruction of the notes was the result of foul play by the government. Moreover, the notes in all likelihood would not have been of any use to the defense. According to Seagream's own testimony, the notes did not relate to the crucial issue in the case, which was whether petitioners knowingly participated in the fraudulent scheme. The only imaginable purpose the notes could have served would have been to assist the defense in impeaching Seagream's trial testimony as to the time at which events occurred. Here, as in *Grammatikos*, 633 F.2d 1013, "[t]he conceivable prejudice flowing from [the] deprivation [of the material at issue] is hardly as compelling as [a

claim] that the missing evidence would affirmatively establish the appellants' factual innocence." *Id.* at 1020. Finally, even ignoring Seagream's testimony, the government's case against petitioners was strong. Sheehy's testimony established petitioners' authorization of the Sun Carpet Co. transaction. The documentary evidence established a motive, namely the preservation of Sheehy at the bank so that petitioners could continue to receive loan funds despite their poor financial situations. Thus, the Court concludes that the loss or destruction of Seagream's notes does not warrant overturning petitioners' convictions. The United States Attorney's Office is, however, admonished to fulfill its duty to preserve all potential Jencks Act material. *See Grammatikos*, 633 F.2d at 1019; *see also infra* note 57.

### f. Letters from Charles Sheehy to Eugene Grevenberge and Don Drossell

This set of documents consists of four letters from Charles Sheehy to Eugene Grevenberge and three letters from Sheehy to Don Drossell. The United States conceded that the government possessed the Grevenberge letters at or before the time of the criminal trial, but did not provide them to the defense.

The letters concern repayment of the Mastertrax debt. Apparently, Sheehy believed Grevenberge was a business associate of Drossell; Drossell, in turn, guaranteed part of the Mastertrax debt and received loans from Sheehy. The May 15, 1979 letter to Grevenberge emphasized the need to liquidate the Mastertrax debt as rapidly as possible. Sheehy indicated that the bank was counting on Drossell's efforts on behalf of Wheels, Inc., a marketing company for Mastertrax, to yield funds to retire the Mastertrax debt. In the next letter to Grevenberge, dated May 30, Sheehy asked Grevenberge to send the check from the "Italian deal" as soon as possible. The June 8, 1979 letter to Grevenberge contained a debt liquidation plan. An August 10 letter again emphasized the need to repay the debt and advised Grevenberge to "[c]ompletely disassociate the frim [sic] from undesirable sources of funds." In a

May 10, 1979 letter to Drossell, Sheehy stated that he had discovered that the security for the Mastertrax debt was impaired and that he was under severe pressure to collect on the Mastertrax loan. Finally, Sheehy again mentioned the "Italian transaction" in a June 26, 1979 letter to Drossell.

At the Section 2255 hearing, Sheehy testified that the "Italian deal" was a licensing agreement to sell a record in Italy. Sheehy denied any knowledge that Mastertrax was receiving money from illegal sources. He explained that the principals of Mastertrax had mentioned that money from questionable sources was available to fund a record project. However, Sheehy insisted that he had no knowledge that Mastertrax or related companies had ever received money from illegal sources. The Court finds that Sheehy was a forthright, credible witness and accepts his testimony.

Petitioners argue that the letters constituted Jencks material because they were, in essence, a diary and were signed and adopted by Sheehy, who testified for the government at the criminal trial. Additionally, petitioners contend that the letters were exculpatory. The letters allegedly emphasize the pressure Sheehy felt to liquidate Mastertrax's debt and the extent to which his judgment was impaired. Further, petitioners urge the Court to draw the inference that the "Italian deal" was a clandestine transaction and that Drossell was involved in illegal activity. Petitioners thus argue that the letter could have been used to impeach Sheehy's credibility and to suggest that Sheehy was pointing the finger at Luke and Lovern to prevent investigation of the Mastertrax operation.

The government contends that the letters are neither Jencks nor *Brady* material. According to the government, the letters are not "statements" of Sheehy within the meaning of the Jencks Act. Further, the government contends that the letters cannot reasonably be read to impeach Sheehy's credibility.

The Court concludes first that the letters are not Jencks Act material. They are not narratives concerning past events, *see Goldberg v. United States,* 425 U.S. 94, 114, 96 S.Ct. 1338, 1350, 47 L.Ed.2d 603 (1976) (Stevens, J., concurring) (a Jencks Act statement is a factual narrative by the witness that is usable for impeachment), and they relate only tangentially to the events to which Sheehy testified. *See United States v. Birnbaum,* 337 F.2d 490, 497 (2d Cir.1964) (defense not entitled to statements which are "'incidental'" or "'collateral'" to testimony) (quoting *United States v. Cardillo,* 316 F.2d 606, 615 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 169 (1963)). In any event, nondisclosure of the letters did not result in prejudice to petitioners. To the extent that the letters showed that Sheehy was under pressure to resolve the Mastertrax problem and that his judgment was impaired, any impeachment based on the letters would have been cumulative to that which occurred at trial. *See McKenzie,* 768 F.2d 602, 608. Further, as Sheehy's testimony at the habeas corpus hearing demonstrated, the defense would not have been able to show through cross-examination of Sheehy that he had knowledge that Drossell was involved in illegal activity or had received funds from questionable sources. Attempted impeachment on this collateral topic would have had no impact on the jury. Accordingly, even if the letters were Jencks Act statements, nondisclosure does not warrant overturning petitioners' convictions.

As for the alleged *Brady* violation, the letters do not contain material adverse to Sheehy's credibility. *See United States v. Giglio,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Even assuming, *arguendo,* otherwise, there is no reasonable probability that disclosure would have affected the outcome of the trial. Nondisclosure of the letters was, therefore, harmless error.

g. Interview Form of Jennifer Trent [36]

According to petitioners, the FBI interview form pertaining to Jennifer

---

**36.** As with the Harrison report, the government

stipulated that if Trent had been called at peti-

Trent, a note teller who worked with Sheehy at the bank, should have been disclosed pursuant to *Brady*. They contend the report establishes that petitioners did not authorize the transfer of funds from Luke's account. In support of this proposition, they point to Trent's statement to Agent Crump that she recalled Sheehy directing her to prepare a memorandum to debit Luke's account to pay off the Mastertrax notes.

In the Court's view, the interview summary cannot be imbued with the meaning petitioners ascribe to it. Trent reported only that she effected the transfer of funds at Sheehy's direction. It is not a fair inference from Trent's comments that petitioners did not authorize the transaction or collude with Sheehy in the scheme. On the contrary, Trent's comments are entirely consistent with petitioners' involvement in the fraudulent scheme. Further, the report is consistent with Sheehy's testimony at trial that he directed the transfer of funds on June 21, 1979 and that neither Luke nor Lovern was present. Therefore, the report was not material to petitioners' guilt or innocence within the meaning of *Brady*.

### h. Loan Memoranda

A number of loan memoranda were not produced to the defense.[37] These documents, which were prepared by Sheehy and date from December 1976 to June 25, 1979, show the amount of the loan extended on a particular date and the amount of "indirect/related" debt. Petitioners assert that *Brady* compels reversal because these documents would have bolstered the argument that the corporations receiving the loan proceeds were legitimate. Additionally, petitioners claim that the bank's management would easily have been able to determine from these documents that Sheehy had exceeded his lending authority with respect to petitioners and their corpo-

rations. Therefore, the documents would allegedly have discredited the government's argument at trial that Sheehy and petitioners were attempting to hide the extent of petitioners' indebtedness by creating sham corporations.

The Court concludes that the memoranda do not contain exculpatory material and thus are not encompassed within the *Brady* rule. The documents do not show that petitioners' corporations were legitimate enterprises which were not formed for the purpose of obtaining additional loans. Further, Sheehy's superior at the bank, William Pruitt, testified at the post-conviction hearing that he did not in fact realize that Sheehy had loaned petitioners an amount exceeding his lending authority until after the investigation of Sheehy's activities had begun. He also explained that the memoranda did not contain sufficient information to allow the bank to determine that Sheehy had exceeded his lending authority. In any event, Sheehy stated that he did not complete the memoranda until shortly before he left the bank, because his purpose was to "keep the bank in the dark about these interrelated loans."[38] The memoranda have no bearing on the essential issue which faced the jury, namely whether petitioners authorized the Sun Carpet Co. transaction. Even granting the memoranda some marginal exculpatory value, their nonproduction does not undermine confidence in the jury's verdict. Accordingly, nondisclosure of the memoranda does not warrant relief.

### i. Walter Paulette Work Paper[39]

A similar conclusion is warranted with respect to a one-page worksheet prepared by Walter Paulette, a former Central Fidelity Bank auditor. The worksheet indicates that loans were made to ARS, Inc., one of Seagream's and Drossell's entities,

---

tioners' criminal trial, she would have testified to the information contained in the report of her interview. Habeas Corpus Tr., at 18. In addition, the government does not contest that it possessed Trent's form at the time of trial.

**37.** The government stipulated that these documents were in the possession of the prosecution at the time of the criminal trial.

**38.** Habeas Corpus Tr., at 207.

**39.** The government did not contest that it possessed this document at the time of trial.

on June 8, 1979, July 17, 1979 and August 13, 1979 and shows the amounts of the loans and how the proceeds were disbursed. According to this document, part of the proceeds of the first loan were used to pay the Mastertrax debt and the third loan was used to pay the previous two notes. Petitioners contend that because the worksheet reveals that additional loans were made to Seagream's affiliates after the Sun Carpet Co. transaction, it would have "destroyed the [government's] theory that Sheehy could not loan [Seagream] more money and that [petitioner's] were [Sheehy's] salvation." [40]

Even accepting petitioners' characterization of the government's theory, the worksheet does not have material exculpatory value. Defense counsel's questioning of Sheehy at trial makes clear that counsel were aware that Sheehy had loaned Seagream's entities large sums after the Sun Carpet Co. transaction. The document would have added nothing to information already available to defense counsel. Even assuming the document falls within *Brady*, there is no reasonable probability that it would have affected the outcome of the trial.

### j. Performance Evaluation of Charles Sheehy [41]

■ Petitioners assert that Sheehy's performance evaluation is *Brady* material. The document, dated March 15, 1979, states that, "Mr. Sheehy will have to play a greater role in new business development activities. This is an area which should be emphasized for 1979." According to petitioners, the document would have shown that Sheehy was under pressure from the bank to develop business, and therefore it would have cast doubt on the government's argument that Sheehy exercised poor banking judgment in extending loans to petitioners. This contention is meritless; the performance evaluation was not *Brady* material. The document, prepared two months before the Sun Carpet Co. transaction, had no bearing on petitioners' guilt or innocence or on the credibility of the government's witnesses. Again, there is simply no reasonable probability that this document would have led to a different result.

### k. Signed Statement of Sheehy

■ Luke contends that the government failed to turn over a signed statement of Sheehy memorializing Sheehy's statements to Crump. At the Section 2255 hearing, the government presented testimony of FBI Agent O'Donnell. Agent O'Donnell stated that he had searched the FBI's and United States Attorney's files relating to petitioners and found no such statement. Neither petitioner presented any persuasive evidence that a statement signed by Sheehy was ever in the government's possession. The Court concludes that no such statement was ever in the government's possession, and therefore the government could not have violated its *Brady* and Jencks Act obligations in this regard.[42]

## B. Ineffective Assistance of Counsel

### 1. *Standard to be Applied in Assessing Allegations of Ineffective Assistance of Counsel*

The standard for evaluating claims of constitutionally defective representation is well-settled. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984), the Court propounded a two-step analysis:

**40.** Pretrial Memorandum of Petitioner Luke, at 4.

**41.** The government did not contest that it possessed this document at the time of trial.

**42.** Luke also complains that the prosecution represented to defense counsel that it possessed a signed copy of a statement given to the government by Sheehy. In fact, as the Court has found, the signed statement did not exist. An unsigned statement was turned over to the defense prior to trial. Luke has not shown, however, that the prosecutor's representation was due to anything other than inadvertence. Moreover, Luke has failed to establish that this action prejudiced him in any way. *See United States v. Christophe*, 833 F.2d 1296, 1300–01 (9th Cir.1987); *United States v. Krapp*, 815 F.2d 1183, 1185 (8th Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 174, 98 L.Ed.2d 127 (1987); *United States v. Espinoza*, 641 F.2d 153, 173–74 (4th Cir.), *cert. denied*, 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981).

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064. With regard to the first part of the analysis, because of the pitfalls of evaluating representation in hindsight, the Court directed lower courts to apply a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. As to the second step, the Court emphasized that the defendant must affirmatively prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A review of the trial record, the parties' arguments and the evidence adduced during the Section 2255 proceeding compels the conclusion that defense counsel's performance does not warrant reversal of petitioners' convictions.

### 2. *Alleged Deficiencies*

a. Failure to Investigate and to Interview Witnesses

Lovern complains that his counsel did not speak with Sheehy or his attorney, John Barr, prior to the criminal trial. Further, Lovern claims that his counsel was remiss in making only one telephone call in an effort to contact David Fairchild, the recipient of the two page letter from Sheehy, and in leaving the preparation of Joseph Blackburn's testimony to Luke's counsel. Petitioners also claim that counsel were deficient in failing to interview legitimate businessmen who had worked with petitioners.

Petitioners' allegations that counsel's failure to investigate and to interview witnesses requires overturning their convictions is without merit. As to counsel's alleged failure to contact Sheehy or his attorney, the evidence showed that counsel did make efforts to establish such contact. In a deposition taken in connection with the Section 2255 proceeding, Hooker testified that defense counsel unsuccessfully attempted to locate Sheehy. Hooker added that he believed an attorney for the government told Luke's counsel that Sheehy would not be available to the defense prior to trial. Thus, petitioners did not show that counsel's performance was deficient in this regard. In any event, counsel's failure to speak with Sheehy or his attorney prior to trial could not possibly have been prejudicial because, as Barr, Sheehy's counsel, testified at the habeas corpus hearing, he would not have permitted any discussions between Sheehy and the defense.

As to the failure to contact Fairchild, counsel made a conscious decision that Fairchild would not be able to provide helpful information. Hooker testified during his deposition that Lovern had described Fairchild as "very, very anti-Luke and Lovern." [43] As the Court noted in *Strickland,* "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674. Counsel's failure to interview Fairchild was therefore not professionally unreasonable. Even if counsel's performance was deficient in this regard, however, petitioners have failed to make the showing of prejudice required by *Strickland.* Petitioners only claim of prejudice stemming from the failure to interview Fairchild is that Fairchild would have revealed the existence of the letter from Sheehy. As discussed in connection with the alleged *Brady* and Jencks Act violations, however, the absence of the Fairchild letter did not prejudice the defense. *See supra* pp. 580–583.

---

**43.** Hooker Deposition, at 56.

■ Lovern's claim that his conviction should be overturned because counsel failed personally to conduct the preparation of Blackburn's testimony is frivolous. In no sense can counsel's performance in this regard be labeled professionally unreasonable; rather, counsel made a perfectly legitimate decision to conserve resources by dividing the workload with Luke's counsel, who did prepare Blackburn's testimony. Lovern cannot now complain that his conviction should be reversed because Blackburn's testimony was not as forceful or as exculpatory as he would have liked. Even assuming that counsel's performance was inadequate, Lovern has shown no prejudice flowing from this alleged inadequacy. Although Lovern vaguely asserts that Blackburn did not provide "details" which would have been helpful to the defense,[44] Lovern has presented no evidence specifying what these details were, whether Blackburn, in fact, had knowledge of these details and how Blackburn's testimony would have been different had Lovern's counsel personally prepared Blackburn. Indeed, from Geary's testimony at the Section 2255 hearing, it appears to the Court that the defense did obtain the desired testimony from Blackburn.[45] This Court refuses to vacate petitioners' convictions simply because Blackburn did not make a good witness.

■ The final allegation in this category concerns counsel's failure to interview businessmen with whom petitioners dealt. This claim also does not warrant relief. According to Hooker, the defense believed that it could establish that petitioners were legitimate businessmen through the testimony of James Ennis and Joseph Blackburn. In fact, Ennis testified that he had set up a corporation for petitioners, that he drafted an agreement for petitioners concerning the product "sun carpet" and that petitioners expressed interest in marketing sun carpet. Blackburn, an attorney, stated that he had recovered a judgment for one of petitioners' corporations. In view of the testimony counsel expected to elicit from Ennis and Blackburn, their decision not to interview other potential character witnesses was within "the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065; *see also Briley v. Bass*, 750 F.2d 1238, 1247 (4th Cir.1984) (courts should not second-guess trial strategy decisions), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985). However, even if the failure to interview potential character witnesses was *arguendo* unreasonable, petitioners have made no showing regarding the testimony these witnesses would have provided or how such testimony would have affected the verdict. Accordingly, this asserted ground for relief is insufficient.

### b. Failure to File Brady and Jencks Act Motions

■ Lovern contends that his conviction should be overturned because his lawyers acted unreasonably in failing to file *Brady* and Jencks Act motions. This contention fails to meet either prong of the *Strickland* test. Hooker explained that a joint defense was conducted on behalf of Luke and Lovern and that discovery motions were not filed on behalf of Lovern because Luke's counsel had filed such motions. Lovern has not and cannot claim that Luke's counsel failed to request material vital to Lovern's defense. Moreover, the prosecuting attorney agreed to turn over to the joint defense all *Brady* and Jencks Act material. Lovern's counsel therefore acted reasonably in not filing separate, formal *Brady* and Jencks Act motions. Because all *Brady* and Jencks Act material produced was made available to Lovern's counsel, Lovern also cannot show prejudice arising from the alleged inadequacy.

■ Luke, while recognizing that his counsel did file *Brady* and Jencks Act motions, argues that counsel failed to pursue these motions with the appropriate vigor. Luke presented no testimony or argument during the habeas corpus proceeding as to what additional measures counsel should

---

**44.** Supplemental Memorandum on behalf of Lovern, at 3.

**45.** Habeas Corpus Tr., at 148.

have taken to obtain production of the documents which were not disclosed. Thus, Luke has failed to show that counsel's performance in this regard was professionally unreasonable.

▮ Both petitioners also assert that counsel should have sought a continuance in order to digest documents the prosecution produced the night before trial. At the Section 2255 hearing, Geary, who had been recruited to help the defense in filing motions, testified that he gave some thought to requesting a continuance. Geary, however, rejected the possibility because he did not believe a good faith argument could be made for a continuance. In his words, "I didn't expect there was any way in the world [the trial judge] would have granted it."[46] Moreover, petitioners presented no evidence or authority indicating that a motion for a continuance would have been well-founded. Thus, petitioners have shown neither that counsel's decision was professionally unreasonable nor that they were prejudiced by the failure to seek a continuance. Accordingly, *Strickland* precludes granting relief on this ground.

### c. Failure to Move to Quash the Grand Jury Indictment

▮ Petitioners assert that prosecutorial misconduct and perjury infected the grand jury proceedings and therefore that their counsel should therefore have moved to quash the indictment. Hooker's and Geary's testimony in connection with the Section 2255 hearing establishes, however, that this step was considered and then rejected because counsel did not believe a motion would have been successful.[47] Specifically, Hooker explained that Geary and

Goodman believed that the trial judge might find that, even excluding the allegedly tainted evidence, enough incriminating evidence was produced to the grand jury to justify the indictment. Geary indicated that an additional reason for not filing a motion to quash was that it might have had negative consequences for his client. Petitioners have not shown that counsel's determination was unreasonable. As noted in *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. at 2066.

▮ As to the prejudice portion of the *Strickland* analysis, petitioners have provided no facts or law demonstrating a reasonable probability that a motion to quash the indictment would have been successful.[48] Petitioners have shown the Court nothing to establish that the government or witnesses were guilty of misconduct or that petitioners were prejudiced by the alleged misconduct. *See United States v. Ricks*, 817 F.2d 692, 695–96 (11th Cir.1987) (defendant must show unfair or actual prejudice due to prosecutorial misconduct to obtain dismissal of indictment); *United States v. McKenzie*, 678 F.2d 629, 631 (5th Cir.1982) (dismissal not warranted even for egregious misconduct unless defendant shows actual prejudice), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982); *United States v. Cederquist*, 641 F.2d 1347, 1353 (9th Cir.1981) (defendant must show that prosecutor's conduct "significantly infringed upon the ability of the grand jury to exercise its independent judg-

---

**46.** Habeas Corpus Tr., at 137.

**47.** Hooker stated that he read the grand jury testimony provided to the defense. Hooker Deposition, at 18.

**48.** Petitioners also claim that prosecutorial misconduct and false testimony presented during the grand jury proceeding requires that their convictions be overturned. Even assuming that petitioners have not waived this claim by failing to make a timely motion, Fed.R.Crim.P. 12(b)(2), petitioners adduced no evidence to suggest that the United States Attorney or the witnesses who testified during the grand jury

made knowing misstatements, nor did petitioners establish a reasonable probability that the outcome of the proceedings was affected by these alleged misstatements. *See United States v. Caporale*, 806 F.2d 1487, 1514 (11th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987) *and,* — U.S. —, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987). Moreover, petitioners' challenge to the indictment on this ground is barred by *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). *See infra* pp. 591–592.

ment"); *cf. United States v. Espinoza*, 641 F.2d 153, 173 (4th Cir.1981) (to obtain reversal on ground that prosecutor knowingly presented false testimony at trial, defendant must show a reasonable likelihood that false testimony affected the jury's judgment).

In any event, the Supreme Court's decision in *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), and subsequent lower court decisions [49] strongly suggest that the petit jury's convictions in this case render any errors in the grand jury proceedings harmless beyond a reasonable doubt. In *Mechanik*, the Court held that a violation of Rule 6(d), Fed.R.Crim.P.,[50] did not warrant reversal of the defendants' convictions. The Court described Rule 6(d) as one protecting individuals from charges for which there is no probable cause. *Id.* at 70, 106 S.Ct. at 941. According to the Court, however, "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." *Id.; see also United States v. Hefner*, 842 F.2d 731, 733 (4th Cir.1988) (applying *Mechanik* rule where grand jury foreman not qualified to serve); *United States v. Fountain*, 840 F.2d 509, 514–15 (7th Cir.1988) (applying *Mechanik* rule where defendant alleged the prosecutor used hearsay evidence and omitted to present exculpatory evidence and stating that where defendant alleges violation of a rule designed to protect the innocent, *Mechanik* analysis is appropriate); *Porter v. Wainwright*, 805 F.2d 930, 941–42 (11th Cir.1986) (applying *Mechanik* rule where habeas corpus petitioner alleged that one of the grand jurors was biased and that the

prosecutor had engaged in misconduct), *cert. denied*, —— U.S. ——, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987) *and* —— U.S. ——, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987). The same rule is applicable here, where petitioners question the reliability of certain evidence presented to the grand jury. Because the jury's guilty verdict erases any deficiencies in the grand jury proceedings, defense counsel's failure to move to quash the indictment is harmless error.

d. Failure to Subpoena Bank Records and to Move to Inspect the Bank Records in the Custody of the Government

██ Petitioners argue that had counsel been more diligent, they would have discovered the loan memoranda, the Seagream deposition and the Grevenberge letters. Even assuming, *arguendo*, that the failure to subpoena bank records demonstrated unacceptable performance, there is no reasonable probability that the result of the trial would have been different had the defense possessed these documents.[51] As discussed in connection with the alleged Jencks Act and *Brady* violations, these documents had little, if any, exculpatory or impeachment value, and their nonproduction was harmless error. Necessarily, therefore, counsel's failure to obtain these documents did not prejudice petitioners within the meaning of *Strickland*.

e. Additional Claims of Ineffective Assistance of Counsel

Petitioners remaining complaints do not merit extensive discussion. Lovern asserts that counsel (1) did not participate in the preparation of Luke's testimony; and (2) failed to devise alternative strategies in the event that the motion for judgment of acquittal was denied. Luke claims that coun-

---

**49.** *See United States v. Hefner*, 842 F.2d 731, 733 (4th Cir.1988); *United States v. Fountain*, 840 F.2d 509, 514–15 (7th Cir.1988); *Porter v. Wainwright*, 805 F.2d 930, 941–42 (11th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987) *and* —— U.S. ——, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987).

**50.** That Rule provides:
Who May Be Present. Attorneys for the government, the witness under examination, interpreters when needed and, for the pur-

pose of taking the evidence, a stenographer or operator of a recording device may be present....

Fed.R.Crim.P. 6(d). In *Mechanik*, two witnesses allegedly testified in tandem.

**51.** *See Strickland*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (court need not make a determination as to whether counsel's performance was inadequate when prejudice has not been shown).

sel 1) was inadequately prepared for trial; 2) introduced documents in evidence which he had never read and which were irrelevant and devastating to the defense; and 3) lied to Luke. Both petitioners assert that counsel 1) failed to present documentary and tangible evidence which would have substantiated petitioners' position that they had been conducting legitimate business activities; 2) failed to object when the prosecution compared Seagream to Luke and Lovern; and 3) failed to subpoena psychiatric records of Sheehy. Although specified as grounds for relief in petitioners' habeas corpus motions, these points were not briefed and were touched upon only tangentially, if at all, during these proceedings. The Court concludes that these claims satisfy neither part of the *Strickland* test; petitioners have not met their burden of showing that their attorneys performed inadequately in these areas or that but for the alleged deficiencies, the result of the trial would have been different. *Strickland,* 466 U.S. 668, 689, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674.

### C. Luke's Motion for Summary Judgment

At trial, Luke's counsel questioned Agent Crump about his dealings with Luke during the investigation. In the course of this questioning, the jury learned that Luke refused to be interviewed before consulting with counsel. Additionally, during cross-examination of Luke, counsel mentioned the Fifth Amendment. On advice of counsel, Luke had refused to produce corporate records at the grand jury proceeding.[52] At trial, on direct examination, Luke was asked questions regarding certain corporate documents. On cross-examination, the prosecution pointed out that some of the records appeared to be missing and that Luke had not previously produced any of the records, despite a government subpoena.[53] In response to the prosecution's and the Court's questions as to why the records had not been produced, Luke's counsel, in the presence of the jury, stated, "Judge, he took the Fifth Amendment on them." [54]

Luke contends that his counsel's questioning of Agent Crump and counsel's reference to Luke's invocation of the Fifth Amendment should be analyzed under the principle expressed in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). There, the Supreme Court held that a state prosecutor could not impeach a defendant's exculpatory story by cross-examining the defendant about his silence after arrest and after receiving *Miranda* warnings. *Id.* at 617, 96 S.Ct. at 2244. Petitioner also cites *United States ex rel Macon v. Yeager,* 476 F.2d 613, 616 (3d Cir.1973), *cert. denied,* 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973), where the court held that the Sixth Amendment prohibited the prosecution's use of defendant's consultation with a lawyer the morning after the alleged crime to raise an inference of guilt. These cases are inapposite; neither involves the conduct of defense counsel. On the contrary, the cases deal with the limits which the Constitution imposes on the prosecution's use at trial of a defendant's silence or consultation with counsel. Petitioner has cited no authority outside the *Strickland v. Washington* framework to support constitutional regulation of defense counsel's questioning of witnesses. Accordingly, Luke's counsel's ref-

---

**52.** The contents of voluntarily prepared business records are not protected by the Fifth Amendment. *United States v. Doe,* 465 U.S. 605, 610, 104 S.Ct. 1237, 1241, 79 L.Ed.2d 552 (1984). Under certain circumstances, however, the act of producing such records may be privileged. *Id.* at 612, 104 S.Ct. at 1242. The Court need not reach the issue of whether Luke properly invoked the Fifth Amendment with regard to the documents to resolve his motion for summary judgment.

**53.** Luke claims not only that his counsel's conduct violated his Fifth and Sixth Amendment rights, but also that the prosecutor engaged in

misconduct by questioning him about his previous failure to produce records. According to Luke, the prosecutor's purpose was to elicit testimony that Luke had asserted the Fifth Amendment during grand jury proceedings. Luke's claim is without merit. He has shown neither that the questioning was improper, nor that it prejudiced him. *See* cases cited *supra* note 42; *United States v. Weatherless,* 734 F.2d 179, 181 (4th Cir.), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984).

**54.** Trial Tr., at 268.

erence to Luke's silence merits analysis under *Strickland.*

■ The Court need not address whether the statements and questions at issue demonstrated inadequate performance of counsel within the meaning of *Strickland,* because petitioner has not shown that there is a reasonable probability that, absent the statements, he would not have been convicted. A reading of the 300–page trial transcript leads the Court inescapably to the conclusion that, if counsel's reference to Luke's silence had any effect at all on the evidentiary picture, the effect was "isolated [and] trivial." *Strickland,* 466 U.S. 668, 696, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674. Counsel's probing regarding Crump's dealings with Luke was simply a rather unfocused attempt to test Crump's recollection and to discredit his handling of the investigation. Further, counsel eventually elicited testimony from Crump that Luke had consented to questioning during the investigation. The prosecution made no comment on Luke's reliance on counsel or his silence during the investigation. Given the limited nature of the questioning in the context of the whole record and the independent evidence of petitioner's guilt, the Court declines to overturn the conviction on this ground.

■ A like conclusion is warranted with respect to the corporate records. Prior to the statement, Luke was undergoing intense questioning regarding his previous failure to produce documents in response to a government subpoena. This line of questioning was prompted by the defense's use

of documents which had not been disclosed to the government. In an apparent attempt to deflect attention from this subject, counsel stated that Luke had taken the Fifth Amendment on the records. No further comment was made by the court, the prosecutor or defense counsel regarding Luke's invocation of the Fifth Amendment. In fact, when the court next asked whether there was any special reason why Luke did not bring certain documents to court, Luke replied, "No special reason, no, sir." [55] Viewing the record as a whole, the Court finds that counsel's isolated statement, while unfortunate, did not prejudice petitioner within the meaning of *Strickland.*[56]

### Conclusion

The Court's thorough review of the trial and habeas corpus records compels the conclusion that none of the acts and omissions complained of by petitioners warrants overturning their convictions.[57] While petitioners may not have received a perfect trial, they received a fair trial, free of prejudicial error. *See United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). Accordingly, an appropriate order will enter dismissing the petitions.

55. Trial Tr., at 269.

56. It follows that Lovern also suffered no prejudice under *Strickland* due to Luke's counsel's conduct or his own counsel's failure to move for a mistrial, severance or an instruction to ·the jury because of this conduct.

57. The heart of petitioners' case is the regrettable failure to produce certain documents to petitioners at or prior to the trial. The obligation to do so is undeniable, as the Court finds in this Memorandum Opinion. No satisfactory explanation as to why this failure occurred has been furnished to the Court. Given the seriousness of the prosecution's lapses, steps must be taken

to insure that similar failures to produce do not recur. Accordingly, the Court directs the United States Attorney or his designate to inquire into why certain documents were not produced to petitioners in a timely fashion and what steps have been taken to insure against recurrences. A report on these questions must be submitted to the Court within thirty days of the date of this Memorandum Opinion. Application to the Court for an extension of time may be made if necessary.

The record should reflect that the government's representative in the cases presently before the Court, Assistant United States Attorney Robert W. Jaspen, was not involved in the prosecution of petitioners.